### VAUGHAN v. COMMISSIONER OF INTERNAL REVENUE.*

### COMMISSIONER OF INTERNAL REVENUE v. VAUGHAN.

No. 227.

Circuit Court of Appeals, Second Circuit.

Aug. 10, 1936.

---

*Writ of certiorari denied 57 S. Ct. 232, 81 L. Ed. —.

William M. Sperry, 2nd, and Albert S. Wright, both of New York City, for William W. Vaughan.

Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and John G. Remey, Sp. Assts. to Atty. Gen., General Counsel, for Commissioner of Internal Revenue.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is a petition by the taxpayer William W. Vaughan, and a cross-petition by the Commissioner of Internal Revenue to review a decision of the Board of Tax Appeals sustaining in part the Commissioner's determination of a deficiency of income tax for the calendar year 1929.

The taxpayer as a member of the firm of Vaughan & Co. conducted a stock brokerage business in the city of New York in partnership with his father from 1901 until the death of the latter in 1920. Thereafter he carried on the business as sole proprietor under the name of Vaughan & Co. until March 19, 1929. At that date he entered into an agreement with Burns and Toomey, old employees, under which the three were to become associated in the stock brokerage business under an arrangement whereby each was to share in the profits and contribute to the losses in certain proportions, subject, however, to the guaranty by Vaughan that the other two should, irrespective of the amount of profits of the business, receive and retain a certain minimum as a drawing account and also subject to an agreement on his part that they would not have to contribute to firm losses except from such profits as they might receive over and above their drawing account. The agreement recited that the "parties hereby associate themselves together as copartners upon the terms and conditions hereinafter set forth to carry on a general brokerage business in stocks, bonds and other securities." Vaughan provided all the capital and was given a discretionary power to broaden the business if he thought best so as to include transactions in unlisted securities and commodities. It also provided that he might engage in transactions for the purchase and sale of securities and of commodities in his individual right and carry on the business of dealer therein, but such transactions should be deemed partnership transactions and losses should be shared and expenses borne as in the case of other business of the firm.

During the period when Vaughan was conducting the business as sole proprietor, as well as after he formed the association with Burns and Toomey, his activity was generally that of a specialist on the floor of the New York Stock Exchange, of which he had been a member for many years, in respect to five different stocks, to wit: Pennsylvania Railroad, certificates of Great Northern Iron Ore Properties, stocks of Advance Rumley Corporation (common and preferred), and Callahan Zinc & Lead Company.

A "specialist" is one who, having a position at a designated "post" on the floor of the Exchange, maintains a book in which he enters all offers and bids for the stocks in which he specializes, thus indicating the "market" for the stocks. The offers and bids are ordinarily made by other members of the Exchange. But the specialist is required to be ready at the demand of other brokers to quote the market price and to buy and sell at the closest fluctuations possible. Where the "bid" and "asked" prices furnished by the brokers coincide and the transaction is thereby effected, the specialist acts as a broker in the transaction. But where there is too wide a "spread" between the "bid" and "asked" prices, in order to create a market, he either buys or sells the stock for his own account. Thus he becomes the owner of any stock acquired in this way. In connection with such activity it became advantageous for Vaughan to carry stock of his own, so that when he sold stock at less than the price offered he would have it available for delivery and would not have to "sell short" or borrow the stock.

In addition to his business as a specialist, he bought and sold other stocks listed on the New York Exchange which he dealt in for profit. He testified that he bought these stocks "for the purpose of being a dealer and supplying customers when they wanted to buy them," and not "for the purpose of keeping them as investments," and that this statement would apply not only to the stocks in which he acted as a specialist but also to the other stocks.

The question before us is whether the taxpayer, or the partnership of which he was a member, was a "dealer" in securities, entitled to inventory them in computing net income for the year 1929.

Article 105 of Regulations 74 provides that: "For the purpose of this rule a dealer in securities is a merchant of securities whether an individual, partnership, or corporation, with an established place of business, regularly engaged in the purchase of securities and their resale to customers; that is, one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom. * * * Taxpayers who buy and sell or hold securities for investment or speculation and not in the course of an established business, * * * are not dealers in securities within the meaning of this rule."

The Commissioner held that neither Vaughan nor Vaughan & Co. were "dealers" in securities but were mere traders, and hence not entitled to inventory their securities under the Regulations. The Board of Tax Appeals held that inventories should not be allowed because of failure to show on the returns that the income was computed on an inventory basis and determined a tax deficiency accordingly. We hold that inventories should be allowed as to some of the securities but not as to others.

█ The contention that inventories may not be employed because the returns did not include a statement that inventories were used is without merit. We have already considered a similar objection in our decision in Commissioner v. Stevens, 78 F.(2d) 713, and there held that the failure to supply such information in the return, when prescribed by the regulations, did not preclude the use of inventories, "where * * * the actual method employed conformed, as nearly as possible, to the best accounting practice in the trade and most clearly reflected income, and where there has been a substantial compliance with the statute and regulations."

██ We think that under the regulations Vaughan and the firm of Vaughan & Co. were "dealers" in the five stocks in which they acted as specialists. As specialists they were required by the practice of the New York Stock Exchange to have on hand a supply of the stocks in which they dealt, so as to round out orders in cases where the bid and asked prices did not match, and to make deliveries where they were selling stocks to maintain a market. But we cannot see that they were "dealers" within the meaning of the Regulations in the other securities, which were held and traded in in relatively small quantities, and had no necessary connection with their business except for speculation. We do not think it possible that they purchased or carried such stocks as a supply for customers. Whether they were ever to use them at all depended on the speculative advantage that might arise to themselves. The stocks carried by them as specialists are their real stock in trade necessary for making a market and required for sale to customers in connection with the performances of that function.

On January 1, 1929, Vaughan had on hand a few shares of stock of Texas Corporation, Belding Hemingway, Colorado

Fuel & Iron, Kelly Springfield, and Martin Perry Corporation (only 1280 shares altogether). He likewise had on hand some Mexican bonds and scrip which, like the above stocks, he continued to hold through the year without having any transactions in them. Something more ought to have been shown other than Vaughan's mere statement that he held these securities "for the purpose of being a dealer and supplying customers when they wanted to buy them," in order to satisfy us that they represented a necessary or reasonable equipment for his business. The stocks of the Chicago, Rock Island & Pacific and the Interborough which he carried were in a similar position. On January 1, 1929, he held 100 shares of the former corporation, purchased 300 more before March 19, sold the entire 400 prior to the latter date, and apparently did not acquire more of those shares during the calendar year. He had 100 shares of the Interborough on hand on January 1, 1929, sold them prior to March 19, 1929, and acquired no more before the end of the year.

The partnership purchased 5,600 shares of Consolidated Gas, and 1,000 shares of American Radiator between March 19, 1929, and the close of the year. They sold 4,500 shares of Consolidated Gas during the year, but sold no shares of American Radiator, and had the 1,000 shares still on hand at its close. Between March 19, 1929, and December 31, 1929, they purchased 25 shares of Marmon Motors, 900 shares of Chicago, Rock Island & Pacific, 100 shares of New York, Chicago & St. Louis, 100 shares of Alaska Juneau, 100 shares of United States Steel preferred, and 100 shares of Commercial Solvents, and sold all of these stocks prior to the close of the year. Under such circumstances we think that they were not "dealers" in any of the securities except those in which they acted as specialists. The others they acquired and retained either as investments or for speculation.

In Seeley v. Helvering Commissioner (C.C.A.) 77 F.(2d) 323, and Schafer v. Helvering, 65 App.D.C. 292, 83 F.(2d) 317, where brokers were denied the right to employ inventories, they were not shown to have acted as specialists so that a supply of shares was required for the conduct of their business according to the practice of the New York Stock Exchange.

It may be argued that in Commissioner v. Stevens, 78 F.(2d) 713, we allowed the use of inventories and did not limit the right to employ them to stocks in which the taxpayer acted as a specialist. But there was no discussion in the opinion in that case as to whether the privilege should be granted, where no supply of securities was needed in order to do a normal brokerage business or where little trading was had, few shares were carried, and many of those on hand were held inactive throughout the tax year. Such circumstances existed in the present case in respect to the nonspecialist stocks, and hence the Commissioner's refusal to allow the use of inventories as to these stocks is not to be overthrown.

Even in the stocks in which Vaughan traded as a specialist he was not a dealer throughout the year 1929. He ceased to be one on March 19, 1929, when his firm was organized. His contention that the partnership was no more than his own "alter ego," because he had agreed with the other partners personally to bear any losses, is without merit. That agreement in the firm articles was no more than a promise of personal indemnity, which would not prevent the existence of a true partnership. Clift v. Barrow, 108 N.Y. 187, 15 N.E. 327; Bond v. Pittard, 3 M. & W. 357; Gilpin v. Enderbey, 5 B. & Ald. 954. Accordingly, if Vaughan supplied the necessary data of the market values on March 19, of the stocks he carried as a specialist, he should be allowed to calculate an inventory loss on them from January 1, 1929, to March 19, 1929. The partnership likewise should be allowed to calculate an inventory loss on the stocks it carried as a specialist from March 19, 1929, to the end of that year. On the other hand, neither should in any event be allowed to calculate an inventory loss upon any of the stocks in which he or they did not act as a specialist.

We find in the record no statement as to the market value on March 19, 1929, of the stocks in which Vaughan specialized. Such a statement was plainly necessary in order that inventories might be employed for those stocks during the period prior to the commencement of the partnership in which he was trading individually. He doubtless did not present one because he sought to ignore the partnership on the theory that none existed in contemplation of law and that because of this he could calculate his own inventory loss for the entire year. But as he failed to establish the value of the stocks which he carried

on March 19, 1929, he was not in a position to require the Board to allow him the use of inventories for the period between January 1, 1929, and March 19 of that year. Because of the terms of the partnership articles, however, he was entitled to deduct the losses of his firm in his individual return. Those losses might be computed by the use of inventories by the partnership in respect to the stocks in which they acted as specialists between March 19, 1929, and December 31, 1929. We do not understand that the correctness of the values of such stocks for the period from March 19 to December 31 is questioned. They should be taken at cost at the dates of purchase by the partnership and at market values at the close of the year.

Inasmuch as a rehearing will be necessary, the Board should not only compute the firm income by the use of inventories between March 19, 1929, and December 31, 1929, in respect to the stocks in which it specialized, but should also compute the individual income of Vaughan with the use of inventories in respect to the stocks in which he specialized up to March 19, 1929. He has no right to inventory after March 19, 1929, the 7,875 shares of Great Northern Ore and the 2,400 shares of Callahan Zinc Mines which he retained, for the reason that the activities in all such stocks after that date were those of the partnership and not his own. Such of them as he still held individually he retained as a trader or investor, and not as a "dealer."

The Commissioner has taken a cross-appeal in which he argues that the profits on the sale by Vaughan of his stock in the Corn Exchange Bank which he had held for more than two years should not be treated in accordance with the decision of the Board as a capital net gain taxed only at 12½ per cent. Section 101 of the Revenue Act of 1928 (26 U.S.C.A. § 101 note). This stock which had principally been inherited from Vaughan's father was kept apart from the securities used in his business, was never inventoried, and was plainly held as an investment. The only time any of it was sold was when a merger between the Corn Exchange Bank and another bank was proposed. It is clear that the Board was right in holding that this stock should not be included in the inventories and the net gain realized from the sale of it should be taxed at 12½ per cent.

On the appeal by Vaughan the decree in so far as it disallowed the use of inventories in toto should be reversed and the case remanded, with directions to the Board to assess his tax by allowing the use of inventories for the stocks carried by Vaughan in which he acted as a specialist from January 1, 1929, to March 19, 1929, and for the stocks carried by the partnership in which it acted as a specialist from March 19, 1929, to the end of the year. On the cross-appeal of the Commissioner the decision of the Board that the profits realized from the sales of stock of the Corn Exchange Bank constituted capital net gain taxable at 12½ per cent. is affirmed.