Walter F. Tellier and Evelyn H. Tellier v. Commissioner.
Tellier v. Commissioner
Docket No. 90189.
United States Tax Court
T.C. Memo 1963-212; 1963 Tax Ct. Memo LEXIS 129; 22 T.C.M. (CCH) 1062; T.C.M. (RIA) 63212; August 14, 1963
Michael Kaminsky, *130 122 E. 42nd St., New York, N. Y., for the petitioners. Laurence Goldfein, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the years and in the amounts as follows: Year
Deficiency
1952
$26,965.96
1953
30,955.12
1954
31,938.86
1955
44,741.71
1956
2,227.31
The issues for decision are: (1) whether the gains realized by petitioners on the sale of certain securities constitute ordinary income or capital gains, and (2) whether legal expenses incurred and paid by one of petitioners in the unsuccessful defense of a criminal prosecution are deductible. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife now residing in Rye, New York, filed a joint Federal income tax return with the district director of internal revenue, Lower Manhattan, New York for the calendar year 1952 and filed joint Federal income tax returns with the district director, Newark, New Jersey, for the calendar years 1953, 1954, 1955 and 1956. On each of these returns the occupation of Walter F. Tellier (hereinafter *131 referred to as petitioner) was shown as "Security dealer." In 1935 petitioner started underwriting of securities and purchasing securities for his own account for resale to customers. In 1945, as an individual doing business under his own name, petitioner began underwriting securities that were sold to the public for less than $1 per share. Sometime after 1945 and prior to 1951 petitioner began conducting his activities under the name "Tellier and Company." For the calendar years 1952, 1953, 1954, 1955, and the period January 1 to May 11, 1956 partnership returns were filed in the name of Tellier and Company each showing the date of organization as January 1, 1951 and the business conducted either as "Security Underwriters" or "Underwriting and Trading in Securities." On February 17, 1954 an "Agreement of Partnership" was executed by petitioner, Martin Brosnan and Max Sandler which provided in part as follows: V. The partnership shall exist for the term beginning January 1, 1954 and terminate on December 31, 1954, and shall continue for successive one year periods after the first of January, 1955, unless the general partner holding a 90% interest in the net profits of the *132 partnership terminates the partnership at the end of any designated calendar month. The amount of capital contributed by Walter F. Tellier is $766,182.67 in cash and securities and other assets as per balance sheet attached which shall at all times remain his sole property except as hereinafter provided. VI. Walter F. Tellier has not agreed to make any additional capital contribution. VII. The capital contribution of Walter F. Tellier may be withdrawn, in whole or in part, or increased, in whole or in part, at his sole discretion without notice at any time. VIII. Messrs. Brosnan and Sandler have not contributed any capital, nor are they to be liable for any losses in connection with the partnership business. IX. Salaries of all the partners are to be determined in the sole discretion of Walter F. Tellier, and may be varied by him from time to time without notice. Such salaries are to be considered expenses of the business. X. Mr. Walter F. Tellier is to receive 90% of the net earnings and profits of the partnership and Messrs. Brosnan and Sandler are each to receive five per cent of the net earnings and profits of the partnership. Mr. Tellier is to have sole determination *133 with respect to charges against gross earnings for the purpose of determining net earnings and profits. During the period January 1, 1952 to May 11, 1956 petitioner was the controlling and principal participant in the business conducted under the name Tellier and Company. After May 11, 1956 and for the remainder of 1956, petitioner continued the business of Tellier and Company individually under that name. At all times petitioner exercised complete control over the policy and management of Tellier and Company and the other participants performed only those functions assigned to them by petitioner which included the supervision of employees who worked directly under them. Tellier and Company was registered with the Securities and Exchange Commission as brokers and dealers in securities, and petitioner and Tellier and Company maintained places of business during the years here involved at 1 Exchange Place, Jersey City, New Jersey and at 42 Broadway, New York, New York. At all times material hereto Tellier and Company acted as an underwriter in the public sale of stock offerings of corporations and purchased corporate securities for resale to customers with the purpose of deriving *134 a profit on the spread between the purchase and sales prices. Included in the securities purchased by Tellier and Company for resale were securities which had been distributed through its underwriting activities. In many instances Tellier and Company acted as underwriters in the public sale of securities of corporations starting new businesses with capital entirely raised by an initial public sale of capital stock. Tellier and Company also acted as a broker or agent in the sale of securities and the profits it derived from this function were in the form of commissions. During the years 1947 through 1954 Tellier and Company entered into underwriting agreements with the following corporations: Arkansas Oil Ventures, Ben Franklin Oil & Gas, Cheyenne Oil Ventures, Consolidated Uranium Mines, Dakota Williston Oil, Deardorf Drilling, Deardorf Oil, Electronic Devices, Texas Oil, Nevada Tungsten, Plateau Uranium Mining, Radar Electronics, Television & Radar, Television Equipment, Trad Cabinet, Video Corporation of America, William Penn Gas, Williston Basin Oil Ventures, and Williston Pioneer Oil. These underwriting agreements generally provided that Tellier and Company would use its best *135 efforts to sell an amount of stock, usually 2,000,000 shares, at a fixed price, usually 15 cents per share. Tellier and Company was no receive a selling commission of 25 percent of the proceeds on the sale of the stock and was granted the right either for itself or its nominees to acquire stock purchase warrants at a nominal price, usually $100, covering an amount of stock equal to from 25 to 100 percent of the amount of the corporate stock being offered to the public. The exercise price of these warrants in every instance was equal to or in excess of the public issue price of the stock. In three underwriting agreements the number of warrants Tellier and Company or its nominee could acquire was based on the number of shares sold by Tellier and Company to the public. In one underwriting agreement Tellier and Company made a firm commitment guaranteeing the issuing corporation a stated dollar amount upon the public issuance of the stock. The warrants issued pursuant to all the underwriting agreements were stated to be nontransferable and nonexercisable for a 13-month period following the effective date of the letter of notification filed by the corporation with the Securities and Exchange *136 Commission. The distribution of the securities under the underwriting agreement was performed through the facilities of Tellier and Company. Tellier and Company employed between 15 and 25 salesmen and had approximately 20,000 customers during the years here involved. Selling activities were conducted over the telephone. The salesmen would make numerous calls to customers, sometimes two or more a day to the same customer, in order to induce the customers to buy. Tellier and Company also advertised the distribution of securities to the public in newspapers, financial periodicals, radio and television, and in circulars it sent to its customers. The stock purchase warrants provided for in the underwriting agreements entered into by Tellier and Company were in every instance acquired by petitioner. As an inducement to sell shares of stock of a corporation making a public issuance through the facilities of Tellier and Company, petitioner, for no monetary consideration, would give the salesmen of Tellier and Company a portion of his holdings of the warrants to acquire stock in the corporation. The number of warrants to be received by a salesman was determined by the number of shares *137 of stock that the salesman was able to sell to the public. Petitioner and his wife maintained separate accounts on the ledger of Tellier and Company denominated "investment" accounts. In his investment account petitioner listed numerous securities, including the aforementioned warrants, unlisted stocks in corporations making public distributions of stock through the facilities of Tellier and Company and stocks listed on the New York stock exchange with which neither petitioner nor Tellier and Company had any other dealings. Petitioner transferred securities from his investment account by way of either direct sale to third parties or sales from the investment accounts to the Tellier and Company trading account. These latter transactions were denominated as "crossover" transactions on the books of Tellier and Company. These transfers were limited to stocks and warrants held by petitioners of corporations making public distributions through Tellier and Company. Tellier and Company actively engaged in secondary sales activities with respect to the securities of the corporations it had underwritten. At times Tellier and Company would go"short" with respect to a security. When Tellier *138 and Company was short, and petitioner owned similar stock of that corporation securities would be either loaned or sold from petitioners' investment accounts to the Tellier and Company trading accounts. In crossover transactions petitioner determined the price at which the investment accounts sold and the trading account purchased. The cashier of Tellier and Company had standing written authorization from petitioner to borrow any security in his investment account which Tellier and Company might need either because of a short sale or nonreceipt of security. The cashier had a similar authorization from Evelyn H. Tellier. Petitioner held stock that could not be sold to the public without prior authorization from the Securities and Exchange Commission, and when a demand arose for those securities, petitioner would at times obtain authorization from the Securities and Exchange Commission to distribute the securities to the public. He would then cause the transfer of the securities to the Tellier and Company trading account through crossover transactions, and the securities would be sold to customers out of the trading account, or he would transfer the securities directly to persons who *139 wished to acquire them. Sale of stock warrants acquired by petitioner as part of the underwriting transactions engaged in by Tellier and Company were as follows: Date Ac-
To Whom
Description
quired
Date Sold
Sold
100,000 Consolidated Ura-
William B.
nium Warrants
1951
11/25/52
Weinberger
90,150 Consolidated Ura-
Crossover
nium Warrants
8/30/51
7/17/53
10,000 Television and Ra-
Samuel B. Milt
dar Warrants
1/26/50
6/ 4/52
400,000 Cheyenne Oil
300,000 to R.C.
Warrants
3/11/52
8/13/53
Neher
1,000,000 Plateau Ura-
Cy Guthrie
nium Warrants
8/20/53
10/20/54
473,315 Ben Franklin Oil
Winifred Baird
and Gas Warrants
3/25/52
6/10/55
Foundation
595,571 Lexa Oil War-
Winifred Baird
rants
1951-52
6/10/55
Foundation
Original
Description
Cost
Sales Price
Gain
100,000 Consolidated Ura-
nium Warrants
$ 16.40
$ 96.25
$ 79.85
90,150 Consolidated Ura-
45.08
36,056.55
36,011.47
nium Warrants
10,000 Television and Ra-
54.16
2,000.00
1,945.84
dar Warrants
400,000 Cheyenne Oil
Warrants
54.00
31,999.75
31,945.75
1,000,000 Plateau Ura-
100.00
25,000.00
24,900.00
nium Warrants
473,315 Ben Franklin Oil
and Gas Warrants
92.50
56,795.40
56,702.90
595,571 Lexa Oil War-
rants
177.25
41,686.97
41,509.72
*140 Respondent determined that the gains on the above-listed transactions should be taxed as ordinary income. The expiration of warrants acquired by petitioner as part of the underwriting transactions engaged in by Tellier and Company were reported on petitioners' income tax returns as follows: Long-Term
Date Ac-
Original
Capital
Description
quired
Expired
Cost
Loss
88,370 Television Equipment Warrants
11/20/50
5/29/53
$451.60
[451.60)
94,772 Trad Cabinet Warrants
2/23/51
10/14/53
300.00
(300.00)
85,670 Video Corporation Warrants
1/ 8/50
5/ 1/53
500.00
(500.00)
50,000 Cheyenne Oil Ventures Warrants
3/11/52
11/29/54
14.60
(14.60)
500,000 Arkansas Oil Venture Warrants
5/22/52
3/25/54
50.00
( 49.00) *
452,378 Electronic Devices Warrants
5/ 8/51
6/30/55
179.00
(179.00)
490,418 Nevada Tungsten Warrants
8/ 5/51
6/30/55
92.50
( 92.50)
314,490 William Penn Gas Warrants
1/ 8/52
1/ 5/55
77.00
( 77.00)
547,790 Dakota-Williston Warrants
6/11/52
1956
80.00
( 80.00) **
2,000,000 Radar-Electronic Warrants
4/ 8/53
1956
100.00
(100.00) **
257,300 Williston Basin Warrants
7/ 3/52
1956
75.00
( 75.00) **
300,000 Williston Pioneer Oil Warrants
8/18/52
1956
300.00
(300.00) **
*141 Respondent determined that the losses on the expirations should be treated as ordinary losses. Petitioner also purchased stock in corporations which were making public offerings through Tellier and Company. The purchases were at nominal prices and were in some instances from an officer or director of the corporation. Petitioner acquired 129,230 shares of Lexa Oil stock in 1950 for a total cost of $205. The 129,230 shares were sold in 1952 at a gain of $60,432.45. The sales were recorded in petitioner's investment account on the books of Tellier and Company as "cross-over" transactions and were as follows: No. of
Date
Selling
To Whom
Shares
Sold
Price
Sold
50,000
3/ 7/52
$22,499.75
Crossover
29,230
3/12/52
13,737.95
Crossover
20,000
3/12/52
9,399.90
Crossover
30,000
3/13/52
14,999.85
Crossover
129,230
$60,637.45
*142 Petitioner acquired 94,000 shares of Television Equipment Corp. stock in 1950 at a cost of $773.37. The stock was sold for a gain of $9,538.38 in years 1952 and 1953. The sales were recorded on petitioner's investment account as follows: No. of
Date
Selling
To Whom
Shares
Sold
Price
Sold
1,200
5/16/52
$ 155.95
Crossover
6,000
5/26/52
*
M. S. Wien
1,000
5/26/52
*
J. J. O'Kane,
Jr.
9,000
5/29/52
*
M. S. Wien
19,000
4/17/52
*
Crossover
5,000
6/10/52
*
J. A. Warner
& Co.
7,300
6/13/52
*
M. S. Wien
8,000
6/24/52
919.80
Crossover
5,000
6/30/52
*
M. S. Wien
5,000
6/30/52
*
J. A. Warner,
& Co.
500
6/25/52
*
J. J. O'Kane,
Jr.
2,000
7/ 1/52
*
J. A. Warner,
& Co.
69,000
$ 9,062.20
9,000
3/20/53
$ 449.95
Crossover
16,000
3/10/53
799.60
Crossover
25,000
$ 1,249.55
Samuel B. Milt, J. J. O'Kane, Jr., J. A. Warner & Co. and M. S. Wien were brokers and dealers in securities. Petitioner acquired 616.725 shares of Deardorf Oil Corp. *143 in 1951 at a cost of $1,672.75. The stock was sold in the years 1952, 1953, and 1956 at gains of $3,695.53, $10,326.80, and $2,095.57. The transactions were recorded in petitioner's investment account as follows: No. of
Date
Selling
To Whom
Shares
Sold
Price
Sold
1952
5,300
3/22/52
$ 1,112.70
Crossover
10,000
5/ 1/52
1.00
Carter B.
Haugh
8,700
6/10/52
1,217.55
Crossover
10,000
6/19/52
1,399.50
Crossover
725
6/26/52
101.45
Crossover
1,000
4/17/52
M. S. Wien
35,725
$ 3,832.20
1953
15,000
1/23/53
$ 1,649.25
Crossover
7,000
4/ 2/53
489.65
Crossover
5,000
4/ 2/53
399.75
Crossover
10,000
4/ 8/53
699.50
Crossover
24,000
4/ 9/53
1,678.80
Crossover
10,000
4/15/53
699.50
Crossover
10,000
4/17/53
699.50
Crossover
15,000
4/28/53
1,049.25
Crossover
13,000
5/ 1/53
909.35
Crossover
5,000
5/ 7/53
349.75
Crossover
10,000
5/14/53
699.50
Crossover
10,000
5/19/53
699.50
Crossover
10,000
5/26/53
699.50
Crossover
144,000
$10,722.80
1956
55,000
3/ 7/55
542.25
*
100,000
2/ 2/56
995.00
*
10,000
3/21/56
99.50
*
50,000
4/20/56
435.00
*
26,000
5/ 8/56
193.70
*
196,000
5/11/56
970.20
*
437,000
$ 3,235.65
*144 Petitioner acquired 500,000 shares of Plateau Uranium common stock at a cost of $500 in 1953 from Ulan Hill, a director of the corporation. Petitioner sold 450,000 of such shares to Southwest Securities Co. in 1954 for $22,500, a gain of $22,000. In 1951 petitioner acquired 250,000 shares of Consolidated Uranium common stock for $2,500 from Edward G. Frawley, president of the corporation. Petitioner sold 30,250 shares of such stock in the years 1953 and 1956 for a total gain of $6,186.70. Twenty thousand of the shares were sold in crossover transactions to the Tellier and Company trading account from the Evelyn Tellier investment account. Petitioner also sold the following stocks during the years in issue and reported the gains on those sales as long-term capital gains or long-term capital losses: Long-Term
Capital
Gain or
Long-term
No. of
Date Ac-
Selling
Capital
Shares
Name of
quired
Date Sold
Cost
Price
Loss
Corporation
* 1,000
Video Corp.
1/11/51
4/30/52
$ 2.99
$ 109.95
$ 106.96
* 5,000
Dakota Williston
5/ 9/52
8/26/53
150.00
199.95
49.95
** 10,000
Dakota Williston
5/13/52
5/11/53
1,500.00
499.95
(1,000.05)
* 2,000
Lexa Oil
11/15/51
1/30/53
500.00
259.95
(240.05)
87,500
Oro Yellow-Knife
5/31/47
11/10/53
7,954.60
97.51
(7,857.09)
Goldmines
50
Radar Electronics
1950-1951
9/17/53
.08
1.95
1.87
** 4,500
Arkansas Oil
5/23/52
6/ 1/53
675.00
224.95
)450.05)
Ventures
* 700
Video Corp.
1950-1951
3/10/53
6:.95
* 500
Video Corp.
3/12/53
3.60
49.95
109.30
* 150,000
Electronic
7/11/53
11/15/54
150.00
3,749.25
3,599.25
Devices
10,000
Uranium Drillings
4/ 7/54
2/ 2/56
100.00
12,000.00
11,900.00
8,000
Deardorf Oil
5/ 4/54
5/11/56
861.08
39.60
(821.48)
*145 Petitioner reported the following amounts as income or loss from Tellier and Company in the calendar years 1952 through 1955, the period January 1, 1956 through May 11, 1956 and the period May 12, 1956 through December 31, 1956: 1952
$ (2,178.14) Loss
1953
17,730.16
1954
148,044.00
1955
18,575.13
1/ 1/56- 5/11/56
14,996.28
5/11/56-12/31/56
(50,399.30) Loss
The warrants which were sold by petitioner during the years in issue and the warrants he owned that expired during the years in issue had no readily ascertainable fair market value when they were issued and received by him. The net gains on the sale of securities by petitioners which respondent has determined represented ordinary income were as follows: 1952
$74,755.33
1953
74,089.23
1954
49,184.05
1955
97,864.12
1956
13,277.42 During each of these years petitioners on their Federal income tax returns reported certain other sales of stocks as resulting in capital gains *146 or losses and respondent in his notice of deficiency made no references to such sales. In his notice of deficiency respondent explained his increase in petitioner's income because of considering the net gains on the sale of certain securities as ordinary income by stating that the gains or losses from these transactions "are considered to be ordinary income under Section 22(a) or deductions under Section 23(e) of the Internal Revenue Code of 1939 [Sections 61 and 162, respectively, for the years governed by the Internal Revenue Code of 1954] as representing profits or losses realized as a dealer in securities and not as gains or losses realized from capital transactions. By amendment to his answer respondent alleged that the various warrants and other securities obtained by petitioners pursuant to their underwriting activities, when sold at a profit during the taxable years 1952 through 1956 resulted in ordinary income to petitioners, rather than capital gain, as the warrants and other securities were received in consideration of petitioner's underwriting activities, and had no readily ascertainable fair market value when received. Petitioner was tried *147 and convicted upon a thirty-six count indictment charging him with violations of the fraud section of the Securities Act of 1933, 15 U.S.C. section 77(q)(a); with violations of the mail fraud statute, 18 U.S.C. section 341; and with conspiracy to violate each of those statutes, 18 U.S.C. section 371. Petitioner on April 12, 1957 received concurrent sentences of 4 1/2 years of imprisonment in each count and was fined a total of $18,000 as a result of the criminal conviction referred to above. In connection with the unsuccessful defense of this criminal prosecution, petitioner in 1956 incurred and paid legal expenses in the amount of $22,964.20 and claimed a deduction for such amount as a business expense. Respondent disallowed the claimed deduction. ULTIMATE FACTS The warrants and securities of corporations making public distributions of stocks through underwriting agreements with Tellier and Company which were sold by petitioners in 1952, 1953, 1954, 1955, and 1956 were held by petitioners at the time of such sale for sale to customers in the ordinary course of petitioner's trade or business. Opinion *148 The first issue in this case is whether the gain on the sale of stock warrants and stock by petitioners constituted ordinary income or capital gains. Petitioner takes the position that the various securities were purchased, held, and sold as investment assets and therefore the gains realized are capital gains. Respondent contends that at the time of their sale the securities were held by petitioner primarily for sale to customers in the ordinary course of his trade or business. Respondent in the alternative argues that the gains on the sale of the securities represent compensation for underwriting services rendered by Tellier and Company and, therefore, should be taxed as ordinary income. Petitioner argues that respondent's alternative contention, that the securities were received by petitioner as compensation for services rendered or to be rendered, nullifies respondent's contention that at the time of their sale the securities were held primarily for sale to customers in the ordinary course of petitioner's trade or business. Petitioner states that securities received as compensation ipso facto cannot become a part of a dealer's inventory of stock held for sale to customers. We *149 see no inconsistency between respondent's primary contention and his alternative contention. The manner by which stock is acquired in no way determines how it is held. In fact, petitioner has pointed to nothing to indicate that it is not customary for an underwriter to hold stock which he might receive as compensation for his underwriting activities for sale to customers along with the stock which he is selling in connection with his underwriting activities. Tellier and Company as petitioner's individual business and under a partnership agreement was engaged in the business of underwriting and dealing in securities. Tellier and Company entered into numerous underwriting agreements with corporations some of which were entered into prior to its becoming technically a partnership. The warrants here involved were acquired under the underwriting arrangements and the stocks here involved were acquired in most instances from officers or directors of the corporations making or about to make a public issuance of its stock through Tellier and Company. Petitioner had the same control over the business of Tellier and Company as a technical partnership as he did when it was his sole proprietorship. *150 In each instance here involved, petitioner instead of Tellier and Company acquired the warrants provided for being acquired by Tellier and Company or its nominee in the underwriting agreements. Petitioner also acquired substantial amounts of stock in some of the corporations being underwritten by Tellier and Company. These stocks were purchased by petitioner for less than 1 penny a share even though stock in the same corporation was being offered to the public at that time or soon thereafter at from 15 to 30 cents per share. These stocks and warrants were sold by petitioners during the years in issue in 70 separate transactions. In most instances the securities were listed in an investment account either for petitioner or his wife shown on the ledger of Tellier and Company. At least 37 sales involved crossover transactions whereby the securities were sold from petitioners' investment accounts to the Tellier and Company trading account. As soon as a security was purchased by Tellier and Company from the investment accounts it was resold to some third party. Tellier and Company had free call upon the securities in petitioners' investment accounts. Petitioner divided the stock *151 underwriting and stock dealing businesses between himself and Tellier and Company as he saw fit. Tellier and Company performed the underwriting services for the corporations, yet petitioner always acquired the warrants. Tellier and Company sold the public issue stock by way of vigorous sales campaigns. Once the public issuance was completed, Tellier and Company continued to trade in the stock, buying and selling for its own account. Whenever the Tellier and Company trading account was short on a stock, petitioner, if he or his wife held the particular security, would either lend or sell the security from the investment accounts to the trading account. The price at which the stock was sold from the investment to the trading account was the same or approximately the same amount for which the security was sold by Tellier and Company to the third party customer. The result of petitioner's receiving the warrants and stock individually but treating the sales from his investment account to Tellier and Company's trading account as the sale of capital assets, was to have the selling activities of Tellier and Company result primarily in capital gains. Petitioner controlled the selling activities *152 of Tellier and Company. The clear inference from the record as a whole is that petitioner acquired the securities here involved with the intent of funneling them through Tellier and Company's sales channels in order to receive the benefits of Tellier and Company's activities as a dealer in these stocks but have the gains derived from such activities taxable at capital gains rates. The securities were held by petitioner for relatively short periods, usually about 2 years, and the record does not show this holding period to be any different from the holding period for similar securities in the Tellier and Company trading account. Petitioner's sales were frequent and continuous. Some of the sales were to securities dealers who were also customers of Tellier and Company. These other dealers knew petitioner was holding these securities. Petitioner acquired the securities in large blocs and sold them in smaller quantities. In some instances where the securities were frozen petitioner had them unfrozen by securing approval of the Securities and Exchange Commission and having them sold to the public through the Tellier and Company account. The amount of profit earned by petitioner on sales *153 of stock for the years in issue was approximately twice as large as his net earnings from Tellier and Company as reported on his income tax returns. The volume of sales, petitioner's activities with respect to the securities, and the close relationship between petitioner's investment accounts and the dealing activities of Tellier and Company support the conclusion that the securities here involved were being held by petitioners for sale to customers in the ordinary course of their trade or business. Cf. Burgher v. Campbell, 244 F. 2d 863 (C.A. 5, 1957). Petitioner contends that he was not a "dealer" in securities and that the underwriting operations of Tellier and Company did not qualify as a "dealer" in securities. From this petitioner concludes that all his sales of stock were as an investor or trader with the gains or losses constituting capital gains or losses. Respondent contends that it is unnecessary to determine whether petitioner as distinguished from Tellier and Company was a dealer since the substance of the transactions here involved was that petitioner held the warrants and stocks, the net gains from which respondent has taxed to him as ordinary income, *154 for sale to customers in the ordinary course of Tellier and Company's trade or business which was also petitioner's trade or business. Petitioner points out that since a partner's activities are distinct from those of his partnership, respondent's equating his activities with those of Tellier and Company is unfounded, relying on Vaughan v. Commissioner, 85 F. 2d 497 (C.A. 2, 1936) reversing in part 31 B.T.A. 548 (1934). The facts in the instant case are distinguishable from those in Vaughan v. Commissioner, supra. The facts in that case showed that a separate entity came into existence when the partnership was organized in fact as well as in form. Certain securities in fact became owned by the partnership. The evidence in the instant case shows that petitioner acquired securities issued in connection with Tellier and Company's underwriting contracts. Petitioner treated Tellier and Company's business in all respects as his own. During the period 1952 to May 11, 1956 Tellier and Company may have technically constituted a partnership as petitioner contends; however, in substance Tellier and Company's business was petitioner's business. The *155 facts here which we have set forth in some detail clearly support this conclusion. Cf. Vance Lauderdale, 9 T.C. 751, 756 (1947). For purposes of State law, Tellier and Company may, as petitioner contends, have constituted a partnership. This fact is not determinative in a Federal tax case such as the instant one where in reality the business was that of the petitioner even if in form a partnership. The facts here show that the warrants and stocks, the net gains from which are the subject of this case, were held by petitioner as much for use by Tellier and Company in the conduct of its business as a dealer in stock as if these warrants and stocks had been held in the name of that company. Petitioner could allow this to occur since he completely controlled the determination of what would be considered profits of Tellier and Company. The stocks here involved in almost every instance were either transferred by crossover or loan to Tellier and Company before they were sold, or were sold to customers of Tellier and Company in the same manner as stocks might have been sold by Tellier and Company in the ordinary course of its business as a dealer in stocks. The sales prices *156 of the warrants and stocks were sustained by the advertisement and salesmanship of Tellier and Company. The facts here show that at the time of their sale these warrants and stocks were held for sale to customers in the ordinary course of petitioner's trade or business and the nature of the holding at the time of sale is the determinative factor. J. C. Bradford, 22 T.C. 1057, 1068 (1954) and cases there cited. Petitioner contends that the securities sold by him were never dealer stock and could never be included by him in inventory of dealer stock held for sale to customers in the ordinary course of his trade or business and therefore the provisions of section 117(n) of the Internal Revenue Code of 1939 and section 1236 of the Internal Revenue Code of 1954[1] have no relevancy since these sections cannot operate to transform nondealer securities into dealer inventory. However, petitioner contends that he did in fact identify these securities so that had they been eligible to become dealer stock, his action would have removed them from the inventory of Tellier and Company under the provisions of sections 117(n) and 1236. *157 Petitioner points out that he sold other stock, the gains and losses from the sale of which respondent has not treated as ordinary gains and losses, and that these stocks were held in the same investment account in which the warrants and stocks here in issue were held. Respondent takes the position that no inference can be drawn from the fact that he made no change with respect to certain gains and losses reported by petitioner and further that he does not make any contention relying on the provisions of section 117(n) of the Internal Revenue Code of 1939 and section 1236 of the Internal Revenue Code of 1954. It is respondent's contention that the securities here involved were held by petitioner primarily for sale to customers in the ordinary course of his trade or business and therefore it is of no consequence whether petitioner otherwise might have complied with the provisions of sections 117(n) and 1236. Respondent points out that in any event petitioner has not shown that he did comply with the provisions of these sections since the evidence does not show at what point the warrants and stocks here involved were transferred to petitioner's investment account *158 on the books of Tellier and Company. We think it clear that section 117(n) of the Internal Revenue Code of 1939 and section 1236 of the Internal Revenue Code of 1954 were not intended to enlarge the definition of capital assets so that assets which were in fact held for sale to customers in the ordinary course of a taxpayer's trade or business could be converted into capital assets, the gain from the sale of which would be treated as capital gains, merely by the listing of such assets in an account denominated as an "investment" account. The intent of these sections was to prohibit the treating of the gain upon the sale of stocks by a dealer as capital gain even though the stocks might otherwise have met the tests prescribed for capital assets unless within the time provided by these sections such stocks were clearly identified in the dealer's records as securities held for investment. We hold that the warrants and stocks, the net gains from the sale of which respondent has determined constituted ordinary income in each of the years here involved were property held by petitioner for sale to customers in the ordinary course of his trade or business and sustain *159 respondent in his determination to this effect. Since we sustain respondent in his primary contention, it is unnecessary to pass on respondent's alternative contention that the warrants and stocks were received by petitioner as compensation. The second issue is whether legal expenses incurred and paid in the unsuccessful defense of a criminal prosecution are deductible. The Courts have long held that such expenses are not deductible and one of the reasons for the disallowance of such deductions has been that their allowance would frustrate clearly defined public policy. Burroughs Bldg. Material Co. v. Commissioner, 47 F. 2d 178 (C.A. 2, 1931), affirming 18 B.T.A. 101; Anthony Cornero Stralla, 9 T.C. 801 (1947); Thomas A. Joseph, 26 T.C. 562 (1956); Henry L. Peckham, 40 T.C. - (May 15, 1963) on appeal (C.A. 4, July 10, 1963). See Commissioner v. Heininger, 320 U.S. 467 (1943); and Cf. Tank Truck Rentals v. Commissioner, 356 U.S. 30 (1958). Petitioner argues that the recent Supreme Court opinion of *160 Gideon v. Wainright, 372 U.S. 335 (1963), indicates a public policy of providing legal counsel for defendants in criminal actions and therefore petitioner asserts it should not be inferred that Congress intended to withhold a tax deduction for those employing counsel in defending criminal prosecutions. There is no question that it is in the public interest that defendants have counsel in criminal prosecutions and that it has been held to be a constitutional right secured by the sixth and fourteenth amendments. The fact that an expenditure is in connection with a constitutionally guaranteed right does not require the conclusions that the amount so expended is deductible as an ordinary and necessary business expense. Cammarano v. United States, 358 U.S. 498 (1959). Even though the payment of legal fees in the unsuccessful defense of a criminal prosecution may not be as proximately related to the illegal activity as the payment of the fines and penalties involved in the Tank Truck Rentals case, such legal expenses flow from the illegal acts. Petitioner claims Longhorn Portland Cement Co., 3 T.C. 310 (1944) supports his position. In that case *161 we allowed deductions for payments made in compromise of a State antitrust action brought against the taxpayer and for the legal fees relative to the action. However, in Longhorn Portland Cement Co., supra, we pointed out that the taxpayer was not proven guilty of the alleged antitrust violations, that the Court's judgment in the antitrust action specified that the settlement agreement was not to be construed as an admission of guilt, and further that the taxpayer entered into the settlement rather than assert its innocence for sound business reasons. Petitioner in the instant case was tried and found guilty of the illegal acts with which he was charged. Cf. Henry L. Peckham, supra. We sustain respondent in his disallowance of petitioner's claimed deduction for legal fees paid in the unsuccessful defense of a criminal prosecution. Other issues raised by the pleading have been disposed of by agreement of the parties. Decision will be entered under Rule 50. Footnotes
*. Arkansas Oil Venture warrants did not expire on 3/20/54; rather, they were sold for $1.00 on that date to E. Dahlgren. ↩
**. The warrants of Dakota-Williston, Radar Electronic, Williston Basin, and Williston Pioneer Oil were not treated as expired on the tax returns of petitioners for the year 1956, but were allowed as losses in respondent's notice of deficiency dated September 7, 1960.↩
*. The records did not show a selling price but the total amount received for the sales in 1952 of the 69,000 shares was $9,062.20.↩
*. The record does not indicate to whom these securities were sold.↩
*. These transactions were "crossover" transactions from the "Walter F. Tellier Investment Account." ↩
**. These transactions were "crossover" transactions from the "Evelyn Tellier Investment Account."↩
1. Sec. 117(n), I.R.C. 1939. Dealers in Securities - (1) Capital gains. - Gain by a dealer in securities from the sale or exchange of any security shall in no event be considered as gain from the sale or exchange of a capital asset unless - (A) the security was, prior to the expiration of the thirtieth day after the date of its acquisition or after the date of the enactment of the Revenue Act of 1951 (whichever is the later), clearly identified in the dealer's records as a security held for investment; and (B) the security was not, at any time after the expiration of such thirtieth day, held by such dealer primarily for sale to customers in the ordinary course of his trade or business. (2) Ordinary losses. - Loss by a dealer in securities from the sale or exchange of any security shall, except as otherwise provided in subsection (i) (relating to bond, etc., losses of banks), in no event be considered as loss from the sale or exchange of property which is not a capital asset if at any time after the thirtieth day following the date of the enactment of the Revenue Act of 1951 the security was clearly identified in the dealer's records as a security held for investment. (3) Definition of security. - For the purposes of this subsection the term "security" means any share of stock in any corporation, certificate of stock or interest in any corporation, note, bond, debenture, or evidence of indebtedness, or any evidence of an interest in or right to subscribe to or purchase any of the foregoing. Sec. 1236, I.R.C. 1954↩ contains substantially similar provisions.