*Decision will be entered for the respondent.*

FRANK J. LAUREYS, JR., AND CAROL J. LAUREYS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 23490-85.          Filed January 25, 1989.

*John V. Ryan III,* for the petitioners.
*Theodore J. Kletnick* and *Lawrence Blaskopf,* for the respondent.

COHEN, *Judge:* Respondent determined deficiencies of $310,068 and $171,828 in petitioners' Federal income taxes for 1980 and 1982, respectively, resulting from disallowance of losses claimed by petitioner Frank J. Laureys, Jr. (petitioner), from certain option spread transactions. The

questions presented are (1) whether offsetting positions in such option transactions were a "similar arrangement" protecting petitioner against loss within the meaning of section 465(b)(4);[1] (2) whether the transactions were not entered into primarily for profit or lacked the substance necessary for recognition for Federal income tax purposes; or (3) whether the losses should be treated as capital, rather than ordinary, losses. A preliminary issue is whether respondent's expert report should be received in evidence.

## FINDINGS OF FACT

Many of the facts, including a complete description of the mechanics of option trading, have been stipulated; the stipulated facts are incorporated in our findings by this reference. Petitioners were residents of Woodstock, Illinois, at the time their petition was filed. They filed joint Federal income tax returns for 1980, 1981, and 1982 using the cash receipts and cash disbursements method of accounting.

During the years in issue, petitioner Frank J. Laureys, Jr. (petitioner), was a member of the Chicago Board of Options Exchange (CBOE).

### Basic Option Trading

A stock option is the right to buy or sell a particular stock at a certain price for a limited period of time. The stock in question is called the underlying security. A stock option has two sides, a buyer's side and a seller's side. There are two types of options, call options and put options. An option contemplates future rights and obligations.

In a call option, the seller (or writer) is obliged, if the buyer desires, to sell the underlying stock to the buyer at the buyer's request at any time during the life of the option. The price at which the stock underlying the option will be sold to the buyer of the option is the exercise price, also called the striking price. A CBOE call stock option affords the option buyer this right to buy for only a limited period of time; thus, each option has an expiration date. After this date, the option lapses (that is, expires).

---

[1] All section references are to the Internal Revenue Code as amended and in effect during the years in issue, except as otherwise noted.

In a put option, the seller (or writer) of the put option is obliged, if the buyer desires, to buy the underlying stock from the put buyer at the buyer's request at any time during the life of the option, at the exercise price. Like call options, CBOE put options have expiration dates.

Four specifications uniquely describe any option contract: (a) The type (put or call); (b) the underlying stock name; (c) the expiration date; and (d) the striking price.

As an example, an option referred to as an "XYZ July 50 call" is an option to buy (a call) 100 shares (normally) of the underlying XYZ stock for $50 per share. The option expires in July. The price of a listed option is quoted on a per-share basis, regardless of how many shares of stock can be bought with the option. Thus, if the price of the XYZ July 50 call is quoted at $5, buying the option would ordinarily cost $500 ($5 × 100 shares) plus commissions. The seller (or writer) of the call option would receive $500 ($5 × 100 shares) minus commissions.

The price of an option is sometimes called the premium. The price of an option can be viewed as having two elements: the intrinsic value and the time value. Options are temporary assets because they ultimately expire or are exercised. For a call option, the intrinsic value is the positive difference, if any, between the price of the underlying stock and the strike price of the option. For put options, intrinsic value is the difference between the strike price and the stock price, if any. The remaining portion of the option price is called the time value. As an example, XYZ stock is trading at 48 and the XYZ July 45 call option is trading at 4. The premium of the call option is 4. The intrinsic value is 3 (48 − 45) and the time value is 1 (4 − 3). If XYZ is trading at 48 and the XYZ July 50 call is trading at 2, the premium is 2 and the time value is 2. The call price has no intrinsic value because the stock price is below the call's strike price.

Options are often referred to as being "at the money," "in the money," or "out of the money." An option that is "at the money" has its striking price equal to the market price of the underlying stock. An option is "in the money" when it is advantageous to the owner of the option (ignoring the price at which he acquired the option) to

exercise his right under the option as opposed to acquiring or selling the same number of shares in the stock market. So, disregarding the price (that is, the "premium") at which the owner of a call option bought the call, it is advantageous for the buyer of the call to exercise when the underlying stock price is higher than the exercise price of the option. For example, a long (bought) call option with a striking price of 100 is "in the money" when the underlying price of the stock is higher than $100. The buyer (owner) of the call can buy the stock cheaper from the seller of the call than he could buy it in the stock market. A long (bought) put option, on the other hand, is "in the money" when the underlying stock price is lower than the exercise price of the option. For example, the buyer of the put option with a striking price of 100 is "in the money" when the stock price is *lower* than $100. The owner of the option can sell the stock at a higher price to the seller of the put option ($100) than the put buyer can sell it in the stock market (less than $100). An option is "out of the money" when it would be disadvantageous, ignoring the purchase price the buyer paid for the option, to exercise the option, as opposed to acquiring or selling the same number of shares in the stock market. For the owner of the put, this would be when the striking price of the option is below the market price of the stock. For example, if the put strike price is $100, it would make little sense for the owner of the put to exercise the put at $100 when the put buyer could simply sell the stock in the market for a higher price. Likewise, a call is "out of the money" when the price of the underlying stock is below the strike price of the option, because it is cheaper to buy the stock in the market than to buy it from the seller of the call at a higher strike price. For example, the call with a $100 exercise price would be out of the money when the stock price is less than $100.

Option positions at the CBOE are closed by offset, by exercise and assignment, or by expiration. Offset means that a party must obtain an equal opposite position. This is accomplished by executing an offsetting (or "opposite") trade.

Exercise is the invoking of the right granted under the terms of the option. Assignment is the process of designat-

ing an option writer for fulfillment of the terms of a notice of exercise and the subsequent satisfaction of such terms. Expiration occurs in the absence of exercise or assignment prior to the specified date.

For purposes of this case (as set forth in the joint glossary filed by the parties), a "spread" is a position consisting of both long and short options of the same type or of different types in the same class. A type is a put or a call. Butterfly spreads are situations in which a trader holds three positions in the same expiration month in puts or in calls at three different strike prices, the highest and lowest strike positions are one-half the size of the middle position, and the middle position (the body) is long (or short) and the highest and lowest positions (the wings) are short (or long). The highest and lowest positions are equidistant from the middle position. A calendar spread is an option strategy in which the short-term option is sold and longer-term option is bought (or the reverse), in options of the same class and having the same striking price. Either puts or calls may be used in the calendar spread. A variation of the calendar spread is a horizontal time spread in which a short-term option is sold and a longer-term option is bought (or the reverse), of options of the same class but with different striking prices. There are numerous variations of this strategy.

## CBOE Background

The CBOE is a national securities exchange functioning as a central marketplace, with regulatory and surveillance requirements and the ability to disseminate price, trade, volume, and related information. In 1980 through 1983, over 100 classes of options, some with hundreds of series, were traded at the CBOE. A "class" of options consists of all options on the same underlying security. A "series" of options consists of all options on the same underlying security at the same striking price and same expiration date and unit of trading.

Prior to establishment of the CBOE in 1973, options were traded over the counter with little liquidity. The absence of liquidity in over-the-counter options made closing existing positions by offset difficult. The CBOE for the first time

afforded buyers and sellers of options a central market with sufficient liquidity to close their open positions.

The CBOE is registered under the Securities Exchange Act of 1934, 15 U.S.C. sec. 78a (1978) (the act), and is subject to the jurisdiction of the Securities and Exchange Commission (SEC). Under the act, a "dealer" is anyone engaged in "the business of buying and selling securities for his own account, through a broker or otherwise, but does not include a bank, or any person insofar as he buys or sells securities for his own account, either individually or in some fiduciary capacity, but not as a part of a regular business." 15 U.S.C. sec. 78c(a)(5).[2] Under the act, securities include any "put, call, straddle, option, or privilege on any security." 15 U.S.C. sec. 78c(a)(10). A "market maker" is any "specialist permitted to act as a dealer, any dealer acting in the capacity of block positioner, and any dealer who, with respect to a security, holds himself out * * * as being willing to buy and sell such security for his own account on a regular or continuous basis." 15 U.S.C. sec. 78c(a)(38). A "floor broker" is a trader on the exchange floor who executes orders for others, including market makers.

The CBOE has chosen to separate the broker and dealer functions, allowing a "specialist" to act only as a dealer. CBOE rules refer to such a person as a market maker and provide:

> A Market Maker is an individual (either a member or a nominee of a member organization) who is registered with the Exchange for the purpose of making transactions as a dealer-specialist on the floor of the Exchange in accordance with the provisions of this Chapter. Registered Market Makers are designated as specialists on the Exchange for all purposes under the Securities Exchange Act of 1934 and the Rules and Regulations thereunder. Only transactions that are initiated on the floor of the Exchange shall count as market maker transactions for the purpose of this Chapter and Rule 3.1. [CBOE rule 8.1.]

The CBOE market maker does not have the exclusivity that the stock exchange specialist has. The CBOE market maker can function only as a dealer making quotes without knowing the customer orders that exist. The CBOE market

---

[2]Although these definitions are matters of law, they are included here for continuity and to aid in understanding the factual background of this case.

maker is also subject to the competitive action of other market makers for the same class.

The CBOE market maker is required by the SEC to maintain a liquidating equity "in respect of securities positions in his market maker or specialist account." 17 C.F.R. sec. 240.15c3-1(a)(6)(iii) (1984).

The CBOE system is intended to cause market makers to provide liquidity for customer orders to be filled. First, market makers must make bids and offers in all options classes consistent with the maintenance of a fair and orderly market. Second, the market maker also is restricted in all options classes to bid (i.e., offer to buy) and ask (i.e., offer to sell) spreads of a maximum amount unless the Floor Procedure Committee establishes different maximum amounts. Further, the market maker can bid no more than $1 lower (or offer no more than $1 higher) than the last trade on a contract plus the aggregate price change in the underlying stock since the last trade, unless this requirement is waived by at least two floor officials.

Pursuant to CBOE rule 8.3, a market maker is "appointed" to one or more classes of options. The appointment may be to "groups," so that if the CBOE market maker applies for one particular class, the CBOE market maker will be appointed to others in the group. The CBOE market maker has continuous obligations for classes of option contracts for which the CBOE market maker holds appointment. Described in CBOE rule 8.7, these obligations include the obligation to engage (in certain situations to a reasonable degree under existing circumstances) in dealings in the CBOE market maker's own account.

When trading in an option class in which not appointed, the market maker must also follow a course of dealings reasonably calculated to contribute to the maintenance of a fair and orderly market. In addition, the market maker must abide by bid and offer and price restrictions. Further, the market maker may be required to respond to any call (i.e., be "called to the post") for market makers on a day in which the market maker has made transactions in a nonappointed class. Upon responding to the call, the market maker shall engage in dealings in those options to the same extent as appointed classes.

The CBOE has a system designed to facilitate the execution (filling) of customer orders. First, the CBOE provides for "opening rotation." This is a procedure the CBOE has adopted where, as the stock market opens before general trading at the CBOE in options, each option contract in a class of options is opened seriatim for each floor broker to match all public orders the CBOE floor broker has, and cross them on public outcry, and then offer (for a short period) the remaining public orders to anyone else (other floor brokers and market makers) who wishes to trade. The rotation period is closed after offers by the floor brokers are either accepted or rejected. After this rotation activity is completed for an entire class of options, general trading begins in that class.

The CBOE also allows a floor broker to cross public orders if the CBOE market maker cannot get a market that is bid as high (or low) as the customer order and the CBOE market maker has another order that is an offer at or near the same price.

The Order Board Official (OBO) system is designed to facilitate the filling of public price or limit orders. A price order is an order to sell or buy at a particular price. A limit order is an order that requires a sale or purchase at the market once the market has trades at a particular price. Where a customer price order is not near the quoted bid and ask prices, a floor broker will give the order to the OBO, who is a CBOE employee. The OBO's function is to hold such orders until the market price moves to a point where the orders can be filled. When the quoted bid or ask price reaches the price of the order held by the OBO, no trade in the option listed on the order can be done at that price by a market maker until the orders held in the "book" (by the OBO) are filled. The OBO may cross orders and may participate in opening and closing rotation in the same fashion as a floor broker.

Further, the OBO may independently, or at the request of a floor broker, call market makers who are appointed in that class of options and any market maker who executed a trade in that class that day, to make a two-sided or one-sided market. If a market maker is standing at any post where a particular stock is traded, he must provide a

market for any stock at the post upon the inquiry of a floor broker.

Once one acts as a CBOE market maker in a class of options in a day, that party cannot act as a floor broker in any class of options at that location. The CBOE market maker also is limited in each class of options at the CBOE as to the number of contracts the CBOE market maker may hold (known as position limits). The CBOE market maker may not engage in transactions in classes in which the CBOE market maker is not appointed disproportionate in relation to or in derogation of the performance of his or her obligations as a market maker in his or her appointed classes. The obligations of a market maker with respect to his or her appointed options classes take priority over the CBOE market maker's other market maker obligations.

## Price Movement and Risk

There are two basic kinds of market makers, "scalpers" and "position traders." Scalpers attempt to buy and sell very quickly, taking advantage of small market movements. They usually have no positions at the close of trading for the day. To be successful, scalpers need a market that has price movement (volatility), customer orders, and liquidity. Position traders, as the term implies, take positions. Unlike scalpers, who by definition have only one trading tactic, position traders have any number of trading tactics and systems.

A vast number of factors influence the price (premium) of a CBOE option during its lifetime. Generally, but not always, a call will increase in price as the price of the underlying stock increases. Generally, but not always, a put will decrease in price as the price of the underlying stock increases. There are, however, many exceptions to the generalization.

The price of a CBOE option can sometimes rise or fall even if the price of the underlying stock does not move. This can happen even to options that are significantly out of the money. The factors influencing the price movement, and resulting profit or loss, in CBOE options during their lifetime differ from those which influence profit or loss at expiration. For example, assume a call, IBM June 150, is priced at

⅛ on April 1, and the price of IBM is $120. The price of IBM rises to $145 on April 2, and the call increases in price to 1⅝. At this point on this particular position, if the long call were exercised, the owner of the option would be paying $150 for a stock that could be bought in the stock market for $145. The call, however, has increased by 1½ ($150 per option). The buyer could, therefore, close by offset his long call position, through selling an equal number of calls and receiving premium for the short calls. There has been a $150 profit made (excluding commissions, fees, and any other costs).

At the moment of expiration, the profit or loss is, excluding other circumstances, governed by three factors: the price of the option paid or received by the trader, the strike price of the option, and the price of the underlying stock at expiration. For example, the purchaser of a call (the owner) pays a premium. If the stock price does not exceed the strike price when the option expires, the owner will lose the entire premium because the option is worthless. Such owner, at expiration, cannot make a profit (before commissions) unless the price of the underlying stock then exceeds the option strike price *plus* the option premium paid for the call. Therefore, excluding other circumstances, if a call option is purchased with a strike price of $100 and a premium of $10 and exercised when the stock price is $120, the owner has made theoretically a $1,000 profit ($120 − (100 + 10) = $10 × 100 = $1,000), excluding commissions and fees. Likewise, excluding other circumstances, if on expiration the stock price is $100 or lower, the owner has lost $1,000 (the premium), excluding commissions and fees.

The seller or writer of a call is in effect paid the call premium by the buyer. If the seller holds the position to expiration and the buyer does not exercise, the seller retains the entire premium. If on expiration the stock price has not risen above the strike price, the writer or seller who has received the premium retains the entire premium (net of commissions paid). Excluding other circumstances, the seller or writer of a call cannot gain more than the amount of the call premium.

The buyer of a put option is in some respects in the reverse market view, at expiration, to the buyer of a call. Unless the put buyer is able on expiration to exercise the put when the price of the stock is *below* the striking price, the buyer can lose the entire premium in the particular put held until expiration. The buyer of a put option with a strike price of $100 and a premium of $10, would lose the entire premium if the option is held to expiration and the stock price has risen above $100 at expiration. Excluding other circumstances, where the stock price prior to expiration dropped to $80, the buyer of the $100 put option who then held it would theoretically make $1,000 ($100 − 10 − 80 = $10 × 100 = $1,000), before commissions.

The risk in options is not equally divided. The seller of short options has a theoretically unlimited risk. For example, a call might be sold for an asking price of $1 with a strike price of $50, when the underlying stock price is $50. As the stock price goes up, the call price theoretically goes up as well. Since the price of the stock can go up infinitely, so too then can the call price. The long option holder, however, has a theoretically limited loss potential, in that the maximum loss is the premium paid for the call.

### Petitioner's Activities

Petitioner attended Culver Stockton College, where he concentrated his studies in economics and received a B.B.A. degree in 1967. He worked in various securities business minor capacities until 1972, when he became employed by Mitchum, Jones & Templeton, Inc. (M, J & T). There he was an institutional trader engaged in block trading for the firm's customers as well as a registered floor broker on the Midwest Stock Exchange. He was registered with the New York Stock Exchange, was a registered principal with the National Association of Security Dealers (NASD), and a member of the Midwest Stock Exchange. To be a registered principal with the NASD, one has to successfully pass the NASD's registered representative test and principal test.

In 1974, petitioner left M, J & T and became employed at Bache & Co. (Bache), where he became a member of the CBOE and the Chicago Board of Trade. Petitioner became Bache's first CBOE floor broker (passing his floor broker's

test in October 1974), executing the firm's customer orders at the CBOE. At the end of 1975, petitioner left Bache. From then until 1980, he was a market maker at the CBOE, either for a market maker partnership or for his own account. From June 1980 through January 1983, he was a market maker trading exclusively for his own account.

In 1980 through 1982, petitioner spent his full working time as a CBOE market maker. During the period of the trades in issue, his entire income-producing efforts were through his activity as a market maker on the CBOE, and he received practically no other income. The CBOE trading floor opened for trading during this period at 9 a.m. Chicago time; however, petitioner usually arrived at his office before 7 a.m. Prior to going to the floor, he would check his sheets, perform research, review quotes, and refresh himself on market activity and review trading strategies.

After the close of trading, and after checking any final trades, petitioner would usually try to reconcile his trading for the day and continue his research and reading, update his charts and graphs, and conduct various analyses. He would attempt to formulate trading strategies and review existing positions. He would leave the office in the late evening, usually about 8 p.m. He took approximately 4-months vacation a year.

Petitioner did not have a clerk or assistant, did not have a computer, and did not use a hand calculator on the floor. He had no researcher or chartist in his employ. He regularly subscribed to and read various technical market letters and various general publications relating to securities and business. He subscribed to the Stock Option Guide and various charting services. He also prepared and maintained his own charts including daily open-high-low-close bar graphs and point and figure charts in the stock in which he traded options or was otherwise interested. Charts for the options transactions in issue (other than IBM) were kept by petitioner but were destroyed.

Petitioner also referred to charts containing illustrations depicting the market bias, profit and loss profiles, and premium decay effect of individual positions and various combinations of positions, and which indicated various strategies or tactics to be used. The charts included long

and short butterflies, straddles, strangles, backspreads, and boxes and conversions. He also referred to technical information about every option (as of the close of the day before) as to delta, gamma, theoretical value, in all contracts in each class he traded, as well as implied volatility, interest, and dividends (until expiration). These materials plotted the profit or loss potential and gave delta information (based on various assumptions) as the underlying stock price of all option positions in a given class changed. Petitioner also had several reference books he referred to on a regular basis. He could and did also use the CBOE research and library facilities that contain a vast amount of literature and technical information concerning CBOE options and related matters.

By 1980, petitioner had been a CBOE floor broker for 2 years and a market maker for 4 years. He began leasing a CBOE membership in 1978. He bought a CBOE membership in March 1981 for $145,500, which he sold for $210,000 in July 1983.

In September 1979 and on May 9, 1980, petitioner's market maker appointments were in the following options:

*Principal*

Ford Motor Co. (F)
Kerr-McGee Corp. (KMG)
Sperry (SY)
Brunswick Corp. (BC)
Monsanto Co. (MTC)
Johns Manville Corp. (JM)
General Dynamics Corp. (GD)
National Semiconductor Corp. (NSM)
Du Pont (E.I.)
De Nemours & Co. (DD)
Bally Manufacturing Corp. (BLY)

*Supplemental*

General Motors Corp. (GM)
Eastman Kodak Co. (EK)
Walt Disney Co. (DIS)
Pennzoil Co. (PZL)
International Business Machines Corp. (IBM)

These appointments remained in effect at all times until changed in March 1981 to add:

> McDonald's Corp. (MCD)
> Halliburton Co. (HAL)
> AMP, Inc. (AMP)
> Johnson & Johnson (JNJ)
> Houston Oil (HOI)
> Texas Instruments, Inc. (TXN)
> Xerox Corp. (XRX)
> Merrill Lynch & Co. (MER)
> Raytheon Co. (RTN)

and to delete:

> Brunswick Corp. (BC)
> Monsanto Co. (MTC)
> Johns Manville Corp. (JM)
> General Dynamics Corp. (GD)
> Du Pont (E.I.)
> De Nemours & Co. (DD)
> Bally Manufacturing Corp. (BLY)

Additions in November 1981 were:

> Capital Cities/ABC, Inc. (CCB)
> K Mart Corp. (KM)
> UNC, Inc. (UNC)
> General American Oil (GAO)
> Teledyne, Inc. (TDY)
> Federal Express Corp. (FDX)
> Cessna Aircraft (CEA)
> Computer Sciences Corp. (CSC)
> International Telephone & Telegraph (ITT)
> FNC Corp. (FNC)
> Swift & Co. (ESM)
> Aluminum Co. of America (AA)
> AT&T (T)
> Atlantic Richfield Co. (ARC)
> Control Data Corp. (CDS)
> CNW Corp. (CNW)
> Minnesota Mining & Manufacturing Co. (MMM)

Loral Corp. (LOR)
Hewlett-Packard Co. (HWP)

Deletions in November 1981 were:

Walt Disney Co. (DIS)
AMP, Inc. (AMP)
Houston Oil (HOI)
Texas Instruments, Inc. (TXN)
Merrill Lynch & Co. (MER)

In October 1982 the following were added:

Honeywell, Inc. (HON)
General Foods (GF)
General Electric (GE)
Baxter Travenol Laboratories, Inc. (BAX)
Black & Decker Corp. (BDK)
Humana, Inc. (HUM)
Pepsico, Inc. (PEP)
Commonwealth Edison (CWE)

In October 1982 the following were deleted:

National Semiconductor Corp. (NSM)
UNC, Inc. (UNC)
International Telephone & Telegraph (ITT)
FNC Corp. (FNC)
Swift & Co. (ESM)
Xerox Corp. (XRX)
Raytheon Co. (RTN)
CNW Corp. (CNW)
Loral Corp. (LOR)
Hewlett-Packard Co. (HWP)

The CBOE's written Interpretation of CBOE rule 8.7 in 1979 stated that a market maker was to do 50 percent of contract volume in each quarter in his principal appointments and no more than 25 percent in nonappointed options. On April 1, 1981, the required percentage for appointments was increased to 75 percent. Petitioner was informed by the CBOE's Market Performance Committee that he had failed to transact 75 percent of his total contracts in his appointed stocks in the third quarter of

1981; he appeared before the appropriate committee and was warned that action would be taken against him if it occurred again.

During 1980, 1981, and 1982, petitioner earned substantial income from options trading, including a variety of spread transactions. In 1980, he reported partnership income of $490,341 and offset a loss of $383,604 reported on Schedule C. The Schedule C loss included $452,806.73 claimed to have resulted from stock options spread transactions in Teledyne, Inc. (TDY).

During the second half of 1980, petitioner engaged in the following transactions:

|  | Total transactions | TDY transactions |
|---|---|---|
| 3d quarter | 1,345 | 39 |
| 4th quarter | 1,842 | 16 |
| Total | 3,187 | 55 |

Petitioner's TDY transactions amounted to slightly less than 2 percent of his total transactions for the period.

During the second half of 1980, petitioner's transactions resulted in the trading of contracts totaling:

|  | Total contracts | Total contracts |
|---|---|---|
| 3d quarter | 10,406 | 982 |
| 4th quarter | 13,706 | 824 |
| Total | 24,112 | 1,806 |

Thus, TDY contracts traded amounted to slightly less than 8 percent of the total number of contracts traded by petitioner for the period.

The TDY spread losses were included in petitioner's (market maker) dealer accounts and were netted with other gains and losses in determining income or losses reported on Schedule C. He maintained a separate investment account, but it was virtually dormant.

In 1980, TDY stock had risen precipitously in price from June to August 13, 1980. Petitioner was "bearish" on TDY, believing that the stock price would decline. On August 25, 1980, the price of TDY ranged from 159⅜ to 164½. On August 26, 1980, the price of TDY ranged from 163⅜ to 168¼.

On September 3, 1980, the price of TDY stock ranged from 168 to 172. On September 11, 1980, the price ranged

from 173½ to 175¼, and on October 7, 1980, the price ranged from 181½ to 187⅝. During this period, petitioner engaged in various spread transactions. These transactions were consistent with petitioner's portfolio trading strategy, of which his TDY activity was a part. The effect of the transactions, however, was a loss claimed for 1980 and a gain reported in 1981.

As a result of petitioner's 1980 TDY option spread activity, his reported losses for tax purposes were claimed to be as follows:

| Date | Call gain (loss) | Puts gain (loss) | Stock gain (loss) |
|---|---|---|---|
| 08/26/80 | ($155,471.77) | | |
| 08/26/80 | | | ($100) |
| 08/27/80 | (27,733.10) | ($3,975.00) | |
| 09/3/80 | (77,011.28) | | |
| 09/11/80 | (24,026.72) | | |
| 09/12/80 | (102.40) | | |
| 09/16/80 | (71,366.90) | | |
| 10/7/80 | (165,852.82) | | |
| 10/8/80 | 44,772.84 | (495.49) | |
| 12/30/80 | 28,555.91 | | |
| 1980 Total | (448,236.24) | (4,470.49) | (100) |
| 01/17/81 | 434,937.50 | (1,760.50) | |
| Total | (13,298.74) | (6,230.99) | (100) |

On December 30, 1980, petitioner had unrealized gain in his TDY spread in the amount of $443,437.50. On January 17, 1981, petitioner's TDY position was closed out by exercise and assignment.

In 1981, petitioner reported total income of $119,395 including $101,373 on Schedule C. Included among the gains and losses from stock option transactions reported on petitioner's 1981 Schedule C were the following:

| Stock option spreads | Gain (loss) |
|---|---|
| TDY (conclusion of 1980 option transactions) .......... | $434,938 |
| TDY ............................................... | (118,275) |
| PZL................................................ | (107,400) |
| HAL............................................... | (52,068) |
| DEC ............................................... | (48,240) |
| Total.............................................. | 108,955 |

During the last half of 1982, petitioner's largest volume of trading was in MCD and SY. He also engaged in

transactions in IBM, HON, GE, and CCB. Some of the transactions were butterfly spreads, and others were time spreads; some were short positions, and some were long positions. The transactions were consistent with petitioner's market strategy. The effect, however, was a substantial loss from the transactions during 1982 that was offset by transactions to be closed in 1983.

For 1982, petitioner reported total income of $48,478 including $18,733 from Schedule C. Included among the claimed gains and losses from stock option transactions reported on petitioner's 1982 Schedule C were the following:

| Stock option spreads | Gain (loss) |
|---|---|
| TDY (conclusion of 1981 option transactions) | $75,041 |
| PZL (conclusion of 1981 option transactions) | 96,356 |
| HAL (conclusion of 1981 option transactions) | 50,790 |
| DEC (conclusion of 1981 option transactions) | 5,999 |
| GE | (356,900) |
| HON | (90,118) |
| IBM | (79,699) |
| CCB | (152,516) |
| Total | (451,047) |

The gains and losses claimed by petitioner from the option transactions described above were as follows:

| Options | Initial year (loss) | Subsequent year gain | Net gain or (loss) |
|---|---|---|---|
| 1980-81 | | | |
| TDY | ($452,807) | $434,938 | ($17,869) |
| 1981-82 | | | |
| TDY | (118,275) | 75,041 | (43,234) |
| PZL | (107,400) | 96,356 | (11,044) |
| HAL | (52,068) | 50,790 | (1,278) |
| DEC | (48,240) | 5,999 | (42,241) |
| 1982-83 | | | |
| GE | (356,900) | 344,859 | (12,041) |
| HON | (90,118) | 91,436 | 1,318 |
| IBM | (79,699) | 84,435 | 4,736 |
| CCB | (152,516) | 146,540 | (5,976) |

With respect to each of the transactions in issue in this case:

a. Trades were entered into by open outcry auction on the floor of the CBOE during regular trading hours without prearrangement.

b. Trades were reflected in petitioner's market maker account at the CBPE.

c. Transactions were entered into when petitioner was registered with the SEC as a securities broker-dealer, was a member of the CBOE, and was registered with the CBOE as a market maker in CBOE listed options.

d. Long-options contracts obtained by petitioner could be exercised by petitioner at any time through expiration.

e. Short-options contracts obtained by petitioner were subject to assignment at any time through expiration.

f. The position obtained in each transaction could be reduced or closed by petitioner at the CBOE at any time in accordance with CBOE rules.

g. Positions obtained in such transactions were subject to "haircut," i.e., daily reports showing all positions of a trader in options and the underlying securities and used to determined capital committed to open transactions.

h. Accounting for such transactions, the results and positions and the associated financial effect, was performed by petitioner's clearing member on its computerized accounting system.

In the statutory notice of deficiency, respondent made the following determinations:

1a. Tax Year Ended 12-31-80

I. It is determined that losses of $446,988.00 shown on your return as gross receipts from transactions in T.D.Y. Options are not allowed because the gains and losses claimed by you with respect to option straddle transactions cannot be recognized because you have not established that the gains and losses occurred in the manner claimed. The transactions at issue were either shams or devoid of the substance necessary for recognition for federal income tax purposes. Recognition of the claimed loss in 1980 would distort the economic reality of the entire transaction. No genuine loss occurred, the alleged loss was but one step in a series of integrated transactions, and the entire transaction lacked economic reality.

Further, your accounting method, with respect to your straddle transactions has been changed, in order to clearly reflect income pursuant to I.R.C. 446. Therefore, your claimed loss is disallowed.

Additionally, the claimed loss in 1980 is disallowed because of the lack of any profit motive with respect to the tax straddle transaction.

Accordingly, your taxable income is increased $446,988.00 for the tax year ended December 31, 1980.

**1a. Tax Year Ended 12-31-81**

I. It is determined that the losses of $118,275.00, $106,800.00, $52,812.00 and $48,000.00 shown on your return as gross receipts from transactions in T.D.Y. Options, P.Z.L. Options, H.A.L. Options and D.E.C. Options, respectively, are not allowed because the gains and losses claimed by you with respect to options straddle transactions cannot be recognized because you have not established that the gains and losses occurred or occurred in the manner claimed. The transactions at issue were either shams or devoid of the substance necessary for recognition for federal income tax purposes. Recognition of the claimed loss in 1981 would distort the economic reality of the entire transaction. No genuine loss occurred, the alleged loss was but one step in a series of integrated transactions, and the entire transaction lacked economic reality.

Further, your accounting method, with respect to your straddle transactions has been changed, in order to clearly reflect income pursuant to I.R.C. 446. Therefore, your claimed loss is disallowed.

Additionally, the claimed loss in 1981 is disallowed because of the lack of any profit motive with respect to the tax straddle transaction.

II. It is determined that the gains of $434,938.00 shown on your return as gross receipts from transactions in T.D.Y. Options (See adjustment 1a. for the tax year ended December 31, 1980) is eliminated. Therefore, your taxable income is decreased $109,050.00 for the tax year ended December 31, 1981.

**1a. Tax Year Ended 12-31-82**

I. It is determined that the losses of $355,150.00, $86,750.00, $152,250.00 and $81,188.00 shown on your return as gross receipts from transactions in G.E. Options, Honeywell Options, C.C.B Options and I.B.M. Options, respectively, are not allowed because the gains and losses claimed by you with respect to option straddle transactions cannot be recognized because you have not established that the gains and losses occurred or occurred in the manner claimed. The transactions at issue were either shams or devoid of the substance necessary for recognition for federal income tax purposes. Recognition of the claimed loss in 1982 would distort the economic reality of the entire transaction. No genuine loss occurred, the alleged loss was but one step in a series of integrated transactions, and the entire transaction lacked economic reality.

Further, your accounting method, with respect to your straddle transactions has been changed, in order to clearly reflect income pursuant to I.R.C. 446. Therefore, your claimed loss is disallowed.

Additionally, the claimed loss in 1982 is disallowed because of the lack of any profit motive with respect to the tax straddle transaction.

II. It is determined that the gains of $75,041.00, $95,756.00, $50,875.00 and $6,125.00 shown on your return as gross receipts from transactions in T.D.Y. Options, P.Z.L. Options, H.A.L. Options and D.E.C. Options, respectively, (See adjustment 1a.I for the tax year ended December 31, 1981) are eliminated.

Therefore, your taxable income is increased $447,541.00 for the tax year ended December 31, 1982.

1b. It is determined that you overstated your Schedule C gross receipts by $99,018.00. Accordingly, your taxable income is decreased by $99,018.00.

Respondent later conceded that the transactions in issue were not shams. In an amendment to the answer, respondent asserted that the losses claimed by petitioner were limited by the at-risk rules of section 465 and that, if at all deductible, the losses were capital losses and not ordinary losses.

## OPINION

This is one of many cases in which respondent asks us to disallow losses incurred from so-called "straddle" transactions that appear to shift taxable income to later years by offsetting losses in one year by gains that will be recouped the following year. In contrast to most of those cases, respondent does not contend that the transactions here in issue are sham, and the transactions occurred during the course of petitioner's normal business activities. Compare *Glass v. Commissioner*, 87 T.C. 1087 (1986), affd. sub nom. *Herrington v. Commissioner*, 854 F.2d 755 (5th Cir. 1988), affd. sub nom. *Yosha v. Commissioner*, 861 F.2d 494 (7th Cir. 1988); *Fox v. Commissioner*, 82 T.C. 1001 (1984); *Cook v. Commissioner*, 90 T.C. 975 (1988).

Respondent's arguments here are variations of the integrated transaction and wash sale arguments rejected in *Smith v. Commissioner*, 78 T.C. 350 (1982). In this case, however, respondent's specific argument is that offsetting positions in options constitute a "similar arrangement" under which petitioner was not at risk within the meaning of section 465(b)(4). Respondent argues that the transactions were not economically motivated and must have been tax motivated and therefore should be disallowed. Alternatively, respondent argues that if the losses are allowed at all, they should be capital losses rather than ordinary losses, because they were not transactions in options in which petitioner was a market maker, and cannot otherwise be considered dealer activity.

In support of his arguments, respondent requests that we find as factual matters that the maximum risk/reward potential of a butterfly option spread is quantifiable, and that when petitioner established his butterfly spreads in issue, his maximum loss was quantifiable. According to respondent, the accounting and economics of option spread transactions are not the same because accounting (or tax) gains or losses are computed for each separate component (leg) of a spread, whereas economic gain or loss is based on the net differential. Thus, in an economic sense, gains on one leg of an option spread are offset by losses on the other. In an annual accounting or tax sense, however, substantial losses on one leg can be realized while the offsetting gain on the other leg is "locked in."

Respondent goes on to argue that because the "net differential" is relatively small, we should not permit accounting rules to result in losses in a year in which one leg of a transaction is closed. In arguing the legal principles that should be applied, respondent has offered expert testimony that (1) the range of results in an option transaction may be predicted based on the historical performance of the underlying stock, and (2) analysis of the probable results of a transaction can lead to a conclusion of whether or not the transaction was tax motivated. Respondent offers the testimony in relation to the at-risk and profit objective issues. Before dealing with those issues, therefore, we explain our ruling on the offered evidence.

### Expert Testimony

In accordance with Rule 143(f), Tax Court Rules of Practice and Procedure, respondent had an expert report prepared by his expert witness, Dr. Bradford Cornell. In accordance with an order specially tailored to the history and issues of this case, expert reports were to be exchanged between the parties and lodged with the Court several months prior to the trial date. Respondent served and lodged the Expert Report of Bradford Cornell, discussed below. Petitioners did not cause to be prepared any expert reports, but stated in the trial memorandum due at the same time as the expert reports that they did not intend to call any experts but intended to call various witnesses who

would testify about CBOE options, the CBOE and its rules, the CBOE market system, related matters, and trading, particularly spread trading, engaged in by the witnesses.

Thereafter (approximately 6 weeks before trial), respondent filed a motion in limine concerning the testimony of petitioners' proposed witnesses, objecting to such testimony on the ground that the witnesses had not submitted expert reports. Petitioners opposed the motion in limine, arguing that the witnesses were not experts because they intended to testify about the "facts" of their own trading on the CBOE as well as discussing CBOE rules and the nature of CBOE trading. Respondent's motion was granted because the Court concluded that the parties' stipulation set forth substantial information about the CBOE rules, regulations, and procedures; testimony concerning the trades of the proposed witnesses had little, if any, relevance; and the failure to set forth the proposed testimony in pretrial reports was prejudicial to respondent because of his inability to verify or cross-examine the witnesses about the transactions. (The order, however, did not preclude petitioners from calling the witnesses for the purpose of propounding questions to the witnesses and permitting specific objection and ruling as to any such specific questions. During trial, petitioner did not call any witness other than himself to testify about options trading.)

At trial, respondent called Bradford Cornell (Dr. Cornell) as a witness. Dr. Cornell was a professor of finance and economics at the University of California at Los Angeles. He had a Ph.D. degree in financial economics, an M.S. degree in statistics, and a B.S. degree in physics from Stanford University. He was a consultant with Economic Analysis Corp. The substance of Dr. Cornell's report was introduced by him as follows:

There are three key characteristics which determine whether the establishment of an option spread is motivated by tax considerations. The first element is the risk of loss. How large are the potential economic losses relative to tax losses that can be realized by cleverly managing the position? Second, how does the potential for economic profit on the overall position compare with the potential tax savings? Third, what is the economic substance of the trading activity? Are there alternative investments that offer equal or greater potential for profit, offer equal or

less risk, and involve fewer trades and smaller transaction costs, but do not offer the tax benefits?

*For any option spread each of these three characteristics must be analyzed in the context of the investor's overall strategy.* The reason for this is straightforward. A position that appears to be highly risky and appears to offer the potential for large profits when considered in isolation, may have little risk and offer no profit potential in the context of the investor's overall portfolio. The extreme case is a wash sale. Though an investment in 100,000 shares of Genentech stock may appear risky and potentially profitable, the simultaneous purchase and sale of 100,000 shares of stock results in a riskless position with no profit potential. *Of course, wash sales are not legitimate transactions,* but by combining options in a clever fashion portfolios that closely resemble wash sales can be constructed. [Emphasis supplied.]

## He then explained his analytical tools as follows:

The analysis of each option spread is based on a series of position sheets which are attached at the back of this report. To analyze an integrated position over the course of a tax year, a new position sheet is required every time the portfolio is altered significantly. * * * Only by studying all these position sheets as a group can the motive for Mr. Laureys' trading of TDY option spreads during 1980 be discerned.

        *       *       *       *       *       *       *

The position sheet also shows the *delta* for TDY spread. Delta, a widely used measure of risk for option portfolios, is derived from the Black-Scholes option pricing model and states how many shares of stock are equivalent to a given option position. * * *

        *       *       *       *       *       *       *

To illustrate how the stock must move for the overall position to be profitable the graphs show the current stock price as a red line. In addition, the high and low prices of the stock between the date on the position sheet and the end of the year are shown as a pair of blue lines. The blue lines make it possible to compare what the stock would have to do for the position to be profitable with what the stock actually did. For example, with respect to the August 13 TDY position, the maximum profit of $22,000 would have occurred if the stock dropped from about $150 (the red line), where it was on August 13, to $120 on the day the options expired. In fact, the stock traded in a range of $145 to $230 (the two blue lines) from August 13 until the end of 1980.

Though a potential profit of $22,000 may seem substantial, it is minuscule in comparison to the profits or losses that could be achieved on parts of the overall portfolio. For instance, if the stock closed at $175 on the day the options expired in January, 1981, the calls that Mr. Laureys sold would show a loss of approximately $275,000, which could be realized for tax purposes prior to the end of the initial year. However, the losses are offset by a profit of approximately $275,000 on the calls that Mr. Laureys purchased. Since the two cancel out, the overall change

in the value of the portfolio is a small net loss of about $2,200. Nonetheless Mr. Laureys can obtain a tax benefit by realizing the losses in the initial year and holding the profitable positions, as part of a new spread, until the following year.

*It is also possible to estimate the probability that the stock price will be in the range necessary for Mr. Laureys to show a profit. Because the calculations are time consuming and relatively complex, such estimates are calculated for only two positions:* the TDY spread held on September 16, 1980 and the TDY spread held on December 30, 1980.

[Emphasis supplied.]

At the time respondent offered the report in evidence in accordance with Rule 143(f), Tax Court Rules of Practice and Procedure, petitioner objected on the ground that Dr. Cornell was not an expert in CBOE market maker activities or in options transactions. Respondent's counsel argued that the objections were directed at the weight to be afforded to the evidence and not to the qualifications of the witness. The Court acknowledged that the witness was an expert with respect to the economic theory reflected in his report and charts, but took the objection under advisement for consideration of the relevance of the economic analysis to the legal issues. The Court also commented that the witness' opinions on the motive of petitioner and on whether or not wash sales were "legitimate" would be disregarded. The testimony of Dr. Cornell then proceeded as an offer of proof. The admissibility of his report was argued in the briefs.

Respondent argues that Dr. Cornell's opinions are relevant within the meaning of rule 402, Federal Rules of Evidence, the proper subject of expert opinion under rule 702, Federal Rules of Evidence, and not objectionable as an opinion on the ultimate fact because of rule 704, Federal Rules of Evidence. In support of his relevance argument, respondent notes that the Court has held that the phrase "other similar arrangements" in section 465(b)(4) indicates "concern with situations in which taxpayers are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable." See *Porreca v. Commissioner,* 86 T.C. 821, 838 (1986). Respondent argues that Dr. Cornell's report shows that petitioner was effectively immunized from loss and, further, that the analysis shows that "the motivation

for * * * [the transactions] must have been for some reason other than economic profit." Responding to petitioner's characterization as "bizarre" an assertion that it is possible to estimate the probability that a stock will be at a particular price in the future, respondent states "Such a characterization is itself bizarre because it denies that it is possible to use economic and statistical analysis to analyze market-maker transactions."

Petitioner criticizes particular aspects of Dr. Cornell's conclusions, particularly that his "probability analysis" based on past events is an accurate predictor of future stock prices. Petitioner also criticizes the reliability of some of Dr. Cornell's charts, because the underlying data was not checked by Dr. Cornell. Petitioner's primary objection, however, is summarized as follows:

> The charts are also of no use because they do not portray the realities of the CBOE options market. They assume a trade when done remains forever pristine. The charts are directed at expiration date profit and loss, and have no indication of what can happen in between the date of trade and date of expiration. These charts have no relationship to reality. As noted before * * * [petitioner] was subject to many other factors in his trading, such as early assignment * * * , obtaining offsetting positions due to fulfilling request for markets * * * , the inability to do trades at the price and time he desired, out-trades, money necessities, changes of opinion based on market activity, risk control, and loss cutting, to name a few. Further, Cornell's charts ignore * * * [petitioner's] trading in the underlying stock and in puts, when these are excellent indica [sic] of market opinion.

We agree with petitioner that the factual premises of Dr. Cornell's report are unreliable and that neither his testimony nor his qualifications assist in determining petitioner's purpose in engaging in the transactions in issue. As discussed below, we do not believe that the type of economic analysis set forth in Dr. Cornell's report is relevant to the type of risk covered by section 465(b).

First, we believe that Dr. Cornell's testimony is tainted by his perception that, from an economic standpoint, wash sales are not legitimate. Second, his isolation of data as to certain transactions, on certain dates, chosen from a few transactions selected by respondent among hundreds engaged in by petitioner, is not reasonably representative. It is also inconsistent with his own statement that his analysis

must consider "the investor's overall strategy." Third, his assumption of predictability of stock prices is inconsistent with reality and with the existence of an active national options exchange, in which differing views of the future create buyers and sellers at different prices.[3]

The foregoing reasons could well be given for giving little or no weight to the expert testimony if it were received in evidence. That solution, however, is not totally satisfactory. If evidence is received, the opposing party must find ways to rebut it. Rebuttal of evidence that is to be given little or no weight unnecessarily consumes time and imposes on the resources of the parties and the court. Even in a court trial, evidence of marginal relevance may be excluded under rule 403, Federal Rules of Evidence. Time is particularly of the essence in trials before this traveling Court, which is scheduled months in advance for finite periods in cities throughout the United States. The Court particularly should exercise its discretion to exclude expert testimony that would not be helpful to the Court.

In *Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505 (2d Cir. 1977), the Court of Appeals discussed objectionable expert testimony in an analogous circumstance. The court held

---

[3]When asked about the function of the options market if stock prices were predictable, Dr. Cornell testified:

THE WITNESS: Well, the apparent function of the option market, given that you could deal in the stock and the underlying risk free rate and reproduce the options, is that it's a lot cheaper and more efficient. If for example I have this simple belief that IBM stock is going to rise and I want to use that information to make as much money as I can, given limited resources, it's cheaper and more efficient for me to buy the call option than to buy the underlying stock. I can do it with less money and thereby make a bigger return. Same way if I want to hedge. If I have a long position and I want to hedge, it's far cheaper to use the options appropriately to get the appropriate menu of risk return tradeoff I want, than to have to do all this complicated trading in the underlying stock.

THE COURT: Well, wouldn't that assume somebody on the other side of the transaction who had the opposite view of what was going to happen?

THE WITNESS: It could either be the opposite view or opposite risk preferences. For example I may want to buy this IBM call because I think the stock is going to go up and I'm just speculating. Someone else may own the stock, a pension fund, and be riding the call because they want to make a little added income off their ownership of the stock. So there can be a variety of different motives and the option price has to adjust to equalibrate [sic] all those possibilities.

This portion of the proffered testimony is consistent with petitioner's explanations of a variety of reasons for trading in options and undermines the conclusion that only tax motives could explain petitioner's trading.

Dr. Cornell's charts also demonstrated that if Teledyne stock had declined, as petitioner predicted, petitioner would have made a profit. The Court, therefore, asked petitioner's counsel whether he could not derive some benefit from receipt of the report. Petitioner, however, maintained his objections to receipt of the report and testimony in evidence.

that admission of opinion testimony of a securities law expert as to the legal obligations of the parties under a contract was erroneous as a matter of law (and highly prejudicial before the jury). The witness was qualified as an expert in securities regulation and had testified about SEC procedures on prior occasions. The Court of Appeals stated, in portions of the opinion pertinent to the question before us:

> In the case at bar, however, witness Friedman's objectionable testimony did *not* concern only the customary practices of a trade or business. Rather, he gave his opinion as to the legal standards which he believed to be derived from the contract and which should have governed Diners' conduct. He testified not so much as to common practice as to what was necessary "to fulfill the covenant" [of the contract]. * * *
>
> Counsel made timely objection—"that's a legal conclusion." Similarly, the witness opined that "the best efforts obligations requires you to pursue the registration statement unless there is cause beyond your control." This testimony did not concern practices in the securities business, on which Friedman was qualified as an expert, but were rather legal opinions as to the meaning of the contract terms at issue. It was testimony concerning matters outside his areas of expertise. See Federal Rules of Evidence 702. * * *
>
> Not only did Friedman construe the contract, but he also repeatedly gave his conclusions as to the legal significance of various facts adduced at trial. * * *
>
> Friedman was also permitted to testify, over objection, that correspondence between the litigants relating to the payment of one-half the cost of registration by the plaintiffs, * * * was irrelevant * * * . Friedman himself conceded that his opinions were based in part on his "experience and use of the English language." His conclusion that Diners Club had no *legal* excuses for nonperformance was based merely on his examination of documents and correspondence, which were equally before the judge and jury. Thus Friedman's opinion testimony was superfluous. *See VII Wigmore on Evidence,* sec. 1918. As Professor McCormick notes, such testimony "amounts to no more than an expression of the [witness'] general belief as to how the case should be decided." *McCormick on Evidence,* sec. 12 at 26-27. The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case. *McCormick on Evidence,* sec. 12 at 27. * * *

> \* \* \* \* \* \* \*

> One final aspect of Friedman's testimony was objectionable. The expert's dogmatic view that the registration statement should have become effective not more than 70 days after it was filed, derived not from an analysis of the facts involved in formulating this particular registration statement of this particular travel agency, but rather directly from an SEC Report statistic of the *median* time for such effectiveness,

covering all sorts of companies in a variety of industries. The trial judge judicially noticed that the median figure was 70 days, but this hardly justified the categorical conclusions tendered to the jury by the witness as if that precise figure were irrefutable evidence on "reasonableness." * * *

[550 F.2d 509-511. Fn. refs. omitted.]

See also *United States v. Ellsworth,* 738 F.2d 333, 336 (8th Cir. 1984); *Shatkin v. McDonnell Douglas Corp.,* 727 F.2d 202, 208 (2d Cir. 1984).

In the context of valuation cases, we have observed that experts may lose their usefulness (and credibility) when they merely become advocates for the position argued by a party. See, e.g., *Buffalo Tool & Die Mfg. Co. v. Commissioner,* 74 T.C. 441, 452 (1980). In this case, we conclude that Dr. Cornell's report was "an overzealous effort * * * to infuse a talismanic precision" (*Messing v. Commissioner,* 48 T.C. 502, 512 (1967)) into speculation in stock options. The witness purported to use a deceptively scientific analysis to reach a conclusion as to petitioner's subjective intent—an area well beyond the expertise of the witness. He offered opinions as to the "legitimacy" of petitioner's transactions—which was "an expression of * * * [his] belief as to how the case should be decided." See *Marx & Co. v. Diners' Club, Inc.,* 550 F.2d at 510, quoting Professor McCormick. Such opinions transcend the proper use of expert testimony. See generally cases collected at Olicker, "The Admissibility of Expert Witness Testimony: Time to Take the Final Leap?", 42 U. of Miami L. Rev. 831, 864-882 (1988), and Note, "Expert Legal Testimony," 97 Harv. L. Rev. 797, 808-819 (1984). We do not wish to encourage such processes. Petitioner's objections are sustained, and the expert report and testimony of Dr. Cornell will not be received in evidence.

## Section 465(b)(4)

Section 465 was adopted to insure that a taxpayer may deduct losses from an activity only to the extent that he or she is economically or actually at risk for the investment. A taxpayer is considered at risk for the amount of money that he or she contributes to an activity and for amounts borrowed for which he or she is personally liable. Sec.

465(b)(1) and (2). Amounts borrowed, however, do not include "amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Sec. 465(b)(4). Applicability of section 465 is determined on the basis of facts existing at the end of each taxable year. *Capek v. Commissioner,* 86 T.C. 14, 48 (1986).

Respondent argues in this case that petitioner's offsetting positions and options fully protected him against any real loss. He argues that petitioner "was effectively immunized from any risk of economic loss in excess of the maximum potential for loss inherent in his option spread positions."

Petitioner argues that respondent is attempting to avoid the rule that each leg of a straddle constitutes a separate position and to apply an "integration" theory to straddle transactions. Such an integration theory was expressly rejected in *Smith v. Commissioner,* 78 T.C. 350, 385-390 (1982). See also *Miller v. Commissioner,* 836 F.2d 1274, 1278-1279 (10th Cir. 1988); *Boswell v. Commissioner,* 91 T.C. 151 (1988). Petitioner also points out that the types of arrangements referred to in section 465(b)(4) all require two parties, i.e., a guarantor and guarantee, parties to a stop-loss agreement, or a lender and borrower, whereas in this case we are dealing with petitioner's own invested capital and not "borrowed amounts."

Respondent implicitly argues that for tax purposes, losses should be limited to the theoretical maximum potential loss in a straddle transaction, without regard to the actual outcome determined when the second leg of the straddle is closed in a subsequent year. This approach is totally impractical. Such theoretical risks would presumably have to be calculated for each transaction by an economist prior to filing of the taxpayer's return. Alternatively, it would be possible to determine losses for a particular taxable year by "marking to market" investment positions as of the last day of that year. This last approach has been adopted by Congress to a limited extent and is now reflected in section 1092(a)(3) for certain straddles, including certain options, in positions entered into after the years in issue here.

Undoubtedly this is a situation where annual accounting for tax purposes does not reflect economic reality. In similar

situations, we have concluded that "both a nonstatutory wash sale doctrine and the step transaction doctrine are inappropriate to achieve respondent's result." *Smith v. Commissioner*, 78 T.C. at 388; see *Cottage Savings Association v. Commissioner*, 90 T.C. 372, 397-399 (1988). Recently we have held that the statutory wash sale rules do not apply to options (*Gantner v. Commissioner*, 91 T.C. 713 (1988)), and Congress has reacted immediately in the Technical and Miscellaneous Revenue Act of 1988, sec. 5075(a), Pub. L. 100-647, 102 Stat. 3341, amending section 1091(a), effective generally for transactions entered into after October 21, 1988. Marking to market has historically occurred only where Congress has specifically provided for that approach. See *Du Pont v. Commissioner*, 118 F.2d 544 (3d Cir. 1941). We have consistently said that the choice among numerous alternative ways of correcting a problem is a matter that must be left to Congress. *Follender v. Commissioner*, 89 T.C. 943, 951-953 (1987); *Smith v. Commissioner*, 78 T.C. at 387-388.

Respondent's argument hinges on the assertion that the term "similar arrangement" in section 465(b) includes the historically notorious area of tax straddles. We are unpersuaded that Congress intended to deal with the problems of options straddles or spreads by general language in that section. Section 465 is relatively detailed and has been amended many times. The phrase "similar arrangement" is not specifically defined anywhere in the Internal Revenue Code or in the legislative history of section 465. It is understood to be used in the context of immunizing an investor from economic losses in an "unprofitable" transaction. See *Levy v. Commissioner*, 91 T.C. 838 (1988); *Porreca v. Commissioner*, 86 T.C. 821, 832 (1986). There is no reason to believe that Congress would use a catchall phrase to deal with such specific and well-known means of shifting tax liabilities from one year to another.

Language such as "similar arrangements" cannot be defined prospectively, because we cannot anticipate all of the types of transactions that might be subjected to section 465(b) in future cases. We would expect, however, that such cases will involve new and "creative" means of limiting an investor's risk and not such well-recognized, often chal-

lenged, and statutorily addressed problems as options straddles. We conclude in this case that section 465(b)(4) does not limit petitioner's deductible losses.

## Petitioner's Profit Objective

Petitioner testified that he was bearish on Teledyne (TDY) in 1980, and did not believe that the rise in the price of TDY stock could continue. If the price of TDY stock had declined, as he expected, after he established his first position in TDY options, petitioner would have made a profit.

Petitioner's testimony was not as specific as to his reasons for establishing the other positions in issue. He explained his lack of recollection by reference to the 6 to 8 years that had elapsed from the time of the transaction to the time of his testimony and the total number of transactions in which he engaged as a market maker on the CBOE. He testified that he was basically a "spreader" but was sometimes a "scalper" in options. He was sometimes bullish and sometimes bearish, and sometimes attempting to capture a dividend or some other type of price movement in the stock. In making investment decisions, he:

looked at my basic portfolio and I looked at the individual stocks and an overall portfolio and I said that I would have some bull spreads, bear spreads, butterfly spreads, money spreads, and they could be all intermingled where I could have a market opinion that would end up neutralizing out. * * *

He testified that the amount of gain or loss from an options transaction could not be accurately predicted because exercise and various other events might occur prior to expiration. He also testified that commissions could be saved by allowing expiration. Petitioner argues that it is unreasonable to ignore his other transactions, including transactions in the options and stock in issue and other spread transactions engaged in by him. Essentially, he explained his trading as resulting from rapidly changing views as to what would happen to the price of the underlying stock.

The transactions in issue commenced midyear and undisputedly occurred, and there is no direct evidence of tax planning or motivation. Petitioner's testimony was plausible, uncontradicted, and unimpeached. At the end of

trial, having observed his demeanor, the Court commented that his testimony was credible.

Respondent characterizes petitioner's testimony as "self-serving" and argues, in effect, that because the transactions had substantial tax benefits disproportionate to the potential economic losses or gains, the transactions must have been tax motivated. He accuses petitioner of ignoring "overwhelming precedent [that] mandates that petitioners' putative 'tax straddle' losses be disallowed." Primary examples, according to respondent, are *Boswell v. Commissioner,* 91 T.C. 151 (1988); *Glass v. Commissioner, supra; Forseth v. Commissioner,* 85 T.C. 127 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. per curiam sub nom. *Enrici v. Commissioner,* 813 F.2d 293 (9th Cir. 1987), affd. without opinion sub nom. *Bramblett v. Commissioner,* 810 F.2d 197 (5th Cir. 1987), affd. sum nom. *Mahoney v. Commissioner,* 808 F.2d 1219 (6th Cir. 1987), affd. without opinion sub nom. *Woolridge v. Commissioner,* 800 F.2d 266 (11th Cir. 1986); *Fox v. Commissioner,* 82 T.C. 1001 (1984); *Smith v. Commissioner,* 78 T.C. 350 (1982). Respondent describes *Fox* as "a case strikingly similar to the instant case" and asserts that "the transactions at issue seem to have been struck from the same template as those at issue" in *Fox.*

The cases cited by respondent are all distinguishable. They involved taxpayers who were not engaged full-time in the activity in question. We are not here concerned with balancing dual motives or with transactions that could not produce a profit. Compare *Yosha v. Commissioner,* 861 F.2d 494 (7th Cir. 1988), affg. *Glass v. Commissioner,* 87 T.C. 1087 (1986). Petitioner does not acknowledge any tax motivation, and respondent is relying solely on the results of the transactions, arguing that petitioner's trading was not rational in the absence of anticipated tax consequences. Unlike respondent, however, we will not ignore petitioner's testimony, the possibility of profits if his market opinions proved correct, the credibility of rapidly changing market positions in an extremely volatile market, and the propriety and necessity of minimizing, or hedging, risks in petitioner's business. We are persuaded that petitioner's primary purpose in engaging in options transactions, spread transactions, butterflies, and specifically the transactions in issue,

was consistent with and part of his overall portfolio strategy to make a profit. Thus, the transactions had sufficient economic substance to be recognized for tax purposes. See *Yosha v. Commissioner,* 861 F.2d at 499 (88-2 USTC par. 9589 at 85,848-85,849).

## Capital or Ordinary Losses

Respondent alternatively contends that petitioner is not entitled to treat losses sustained in the transactions in issue as ordinary losses because he was not a dealer with respect to those transactions. He argues that petitioner's 1980 TDY spread activities should not be afforded dealer treatment because petitioner was not then appointed as a TDY market maker. He also argues that none of the transactions were engaged in by petitioner in his capacity of market maker. Because this issue was raised by amendment to the answer, respondent bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure. Respondent's burden of proof may be satisfied by any evidence in the record, including petitioner's testimony.

Petitioner argues that because he was a CBOE market maker, he was a dealer in all classes of options listed on the CBOE in which he chose to trade. He asserts that respondent did not meet his burden of proof and has incorrectly described the CBOE, market making on the CBOE, and rules governing CBOE market makers. On this issue, we disagree with both parties to the extent that each argues that appointment as a CBOE market maker or lack of appointment is conclusive evidence as to petitioner's status as a dealer.

Section 1234, during the years in issue, provided rules for treatment of gain from options to buy or sell. (Subsequent amendments to section 1234, and the addition of section 1234A, have altered these rules.) Gain or loss realized by a dealer in options was considered ordinary income or loss. Section 1234(b) contained a special rule for treatment of grantors of stock options, but the subsection "shall not apply to any option granted in the ordinary course of the taxpayer's trade or business of granting options." Respondent states:

The precise question is whether an options dealer, without statutory blessing, should be treated as a dealer for tax purposes with respect to his non-market-making activities. In *Reinach v. Commissioner,* T.C. Memo. 1965-288, affd. 373 F.2d 900 (2d Cir. [1967]), cert. denied, 389 U.S. 841 (1967), a professional writer of options deducted option losses as ordinary losses incurred in his trade or business as a dealer in options. The taxpayer's principal source of income was the writing of options, and he maintained an office with a salaried staff with rented private telephone lines to brokers and wrote option contracts over a three year period. The Tax Court held that since the taxpayer held no securities for sale to customers, he was not a dealer in securities and, therefore, his losses were capital in nature. Therefore, while the literal language of section 1234(b)(3) appears to apply to taxpayers who are in the trade or business of writing options, the Tax Court did not recognize the writing of options, alone, as a trade or business.

\* \* \* \* \* \* \*

Judicial decisions have recognized that a specialist may be a dealer with respect to some securities, but not as to others. *Vaughan v. Commissioner,* 85 F.2d 497 (2d Cir. [1936]), cert. denied 299 U.S. 606 (1936); *Stern Brothers & Co. v. Commissioner,* 16 T.C. 295, 313 (1951). *Vaughan v. Commissioner, supra,* is factually indistinguishable from this case. \* \* \*

Petitioner, on the other hand, argues that he was registered, as required by the CBOE, with the SEC as a dealer and the trades in question were conducted through his CBOE market maker account. Petitioner argues that *Reinach v. Commissioner,* T.C. Memo. 1965-288, affd. 373 F.2d 900 (2d Cir. 1967), relied on by respondent, categorized the taxpayer as a dealer in options but that the loss in question resulted from trading in stocks, which were capital assets.

Petitioner argues that *Vaughan v. Commissioner,* 85 F.2d 497 (2d Cir. 1936), is distinguishable on the ground that the taxpayer in that case was a specialist on the New York Stock Exchange (NYSE), which designates dealers in certain stocks. According to petitioner: A specialist on the NYSE is "unique" because such specialist is the only dealer on the floor in a listed stock; because the CBOE system does not employ specialists and separates the broker function from the dealer function, a CBOE market maker is treated as a dealer in all classes of CBOE options; thus, *Vaughan* has no application to a CBOE market maker.

The issue, as we see it, is whether the specific transactions in issue were engaged in by petitioner as a dealer or, to the extent that those transactions constitute granting of options, whether they were engaged in "in the ordinary course of" petitioner's trade or business. Neither registration nor regulation of petitioner as a dealer under CBOE rules controls the categorization of these transactions for tax purposes. Thus, the distinctions between NYSE specialists and CBOE market makers are not persuasive. We will not here resolve disputes between the parties about the significance of the size of the trading floor, the location or post at which specific options were traded and the distance from the locations where petitioner spent most of his time during the period in issue, and the percentage of transactions represented by the trades in issue. That petitioner's trades were conducted through his market maker account rather than through a personal investment account is merely evidentiary and not conclusive. See *Stephens, Inc. v. United States,* 464 F.2d 53, 60 (8th Cir. 1972); *Stern Brothers & Co. v. Commissioner,* 16 T.C. 295, 316-319 (1951).

In analogous contexts, we have considered whether transactions conducted on a regular basis were "dealer" transactions. In *King v. Commissioner,* 89 T.C. 445 (1987), we considered whether certain commodities were held as a part of the taxpayer's trade or business or for investment within the meaning of section 163(d). In that context, we discussed the distinctions for tax purposes among a dealer, a trader, and an investor. We noted that one who regularly buys and sells on any exchange may be either a dealer or a trader, and that:

a primary distinction for Federal tax purposes between a trader and a dealer in securities or commodities is that a dealer does not hold securities or commodities as capital assets if held in connection with his trade or business, whereas a trader holds securities or commodities as capital assets whether or not such assets are held in connection with his trade or business. A dealer falls within an exception to capital asset treatment because he deals in property held primarily for sale to customers in the ordinary course of his trade or business. A trader, onthe other hand, does not have customers and is therefore not considered to fall within an exception to capital asset treatment.

The distinction between a "trader" and an "investor" also turns on the nature of the activity in which the taxpayer is involved. A trader seeks profit from short-term market swings and receives income principally

from selling on an exchange rather than from dividends, interest, or long-term appreciation. *Groetzinger v. Commissioner,* 771 F.2d 269, 274-275 (7th Cir. 1985), affd. 480 U.S. [23] (1987); *Moller v. United States,* 721 F.2d 810, 813 (Fed. Cir. 1983). Further, a trader will be deemed to be engaged in a trade or business if his trading is frequent and substantial. *Groetzinger v. Commissioner, supra* at 275; *Fuld v. Commissioner,* 139 F.2d 465 (2d Cir. 1943), affg. 44 B.T.A. 1268 (1941). An investor, on the other hand, makes purchases for capital appreciation and income, usually without regard to short-term developments that would influence prices on the daily market. *Groetzinger v. Commissioner,* 82 T.C. 793, 801 (1984); affd. 771 F.2d 269 (7th Cir. 1985), affd. 480 U.S. [23] (1987); *Liang v. Commissioner,* 23 T.C. 1040, 1043 (1955). No matter how extensive his activities might be, an investor is never considered to be engaged in a trade or business with respect to his investment activities. *Higgins v. Commissioner,* 312 U.S. 212, 216, 218 (1941); *Groetzinger v. Commissioner,* 771 F.2d at 275.

[89 T.C. at 458-459. Fn. ref. omitted.]

See also *Heggestad v. Commissioner,* 91 T.C. 778, 785 n. 2 (1988).

Petitioner's explanation of the reasons for the trades in which he engaged persuaded us that those trades were conducted with a profit objective. The extent and nature of them suggests that he was a "trader" rather than an "investor" in options. His explanations, however, all related to his personal profit strategy. None of the trades were justified by reference to CBOE requirements imposed on him as a market maker. He acknowledged that he did not recall any of the trades being attributable to a "call to the post" in which he was required to make a market in a particular stock or option. None of the trades were explained in relation to a customer of the CBOE, except to the extent that petitioner, himself, was a customer. The transactions in issue, therefore, cannot be treated as dealer transactions. See *Brown v. United States,* 192 Ct. Cl. 203, 220-224, 426 F.2d 355, 363-365 (1970). The options granted for petitioner's own account cannot be said to be in the ordinary course of market maker activity because they were not written for the purpose of meeting demands for a market or even for creating liquidity. Thus, petitioner is not entitled to ordinary loss treatment for those transactions.

*Decision will be entered under Rule 155.*